Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――

Argued November 7, 2003       Decided March 26, 2004

No. 03-1008

PDK LABORATORIES INC.,
PETITIONER

v.

UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,
RESPONDENT

―――――――

On Petition for Review of an Order of the
United States Drug Enforcement Administration

―――――――

*Saul Pilchen* argued the cause for petitioner. With him on the briefs was *Joseph L. Barloon*.

*Mark T. Quinlivan*, Senior Trial Counsel, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *Roscoe C. Howard, Jr.*, U.S. Attorney.

Before: RANDOLPH and ROBERTS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

―――――――

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* ROBERTS.

RANDOLPH, *Circuit Judge*: Ephedrine is an active ingredient in over-the-counter medications for the treatment of asthma and nasal congestion. Ephedrine is also used in the illicit production of methamphetamine, a controlled substance. The government regulates ephedrine pursuant to the Controlled Substances Act, as amended by, *inter alia*, the Chemical Diversion and Trafficking Act of 1988, 21 U.S.C. § 801 *et seq.* The Act lists 20 chemicals, including ephedrine, used in the illicit production of controlled substances. 21 U.S.C. § 802(34). Companies and individuals wishing to import (or to export, manufacture or distribute) any of these "List I chemicals" must register with the Drug Enforcement Administration. 21 U.S.C. §§ 957(a), 822(a)(1)-(2). The "regulated person" must notify DEA no later than 15 days before bringing a listed chemical into the country. 21 U.S.C. § 971(a). DEA has the authority to forbid importation if "the chemical may be diverted to the clandestine manufacture of a controlled substance." 21 U.S.C. § 971(c)(1). This petition for judicial review challenges DEA's interpretation of "the chemical may be diverted" as it relates to the importation of ephedrine.

## I.

PDK Laboratories, at its New York facilities, manufactures over-the-counter pharmaceuticals and vitamins, including pain relievers, decongestants, diet aids and nutritional supplements. Some of its products contain ephedrine in combination with other active ingredients. PDK purchases raw, bulk ephedrine from foreign companies, combines the chemical with other active agents, and produces a finished product in tablet form, packaged in bottles or blister packs, all with DEA's permission. PDK currently sells only to wholesale distributors, not to retailers or consumers, although in the past it had a retail mail order business.

Producers of illicit methamphetamine prefer using pure ephedrine. After the 1988 amendments to the Controlled

Substances Act imposed record keeping and other controls on transactions involving pure ephedrine, criminals began substituting "single entity" ephedrine tablets – that is, tablets containing ephedrine as the only active medicinal ingredient – for pure ephedrine. When Congress amended the Act again in 1993 to remove the record keeping exemption for single entity ephedrine tablets, illicit methamphetamine producers switched to pseudoephedrine and combination ephedrine products, such as those PDK and its competitors produce. In order to obtain large quantities of this product, criminals shoplift the tablets from retail stores or, individually and in groups, make multiple purchases of the tablets from different stores – a process known in the drug trade as "smurfing."

PDK has cooperated with DEA in trying to prevent its products from winding up in the hands of methamphetamine producers. It has cut off sales to distributors suspected of selling its drug products in bulk; ended its mail order business; stopped shipping its products to California and Missouri in response to the number of methamphetamine laboratories found in those states; monitored sales to determine if a particular customer has been ordering an extraordinary quantity of its drugs; imposed monthly quotas on its customers; retained a former DEA official to review its compliance program; and altered its packaging to make its over-the-counter drugs less susceptible to illicit uses.

Two of PDK's foreign suppliers of bulk ephedrine are Indace, Inc. and Malladi, Inc., both of which are registered with DEA as importers of chemicals listed in the Act. Indace, in late 2000, and Malladi, in early 2001, notified DEA that they were about to ship ephedrine hydrochloride from India to PDK in New York. Each shipment was to consist of 3000 kilograms of the chemical in powdered form. In both instances DEA issued to the importer an "Order to Suspend Shipment," stating that it acted pursuant to § 971(c)(1) on the basis of information indicating that "the listed chemical may be diverted." By this DEA did not mean that the shipments would be hijacked or otherwise diverted from their intended destination. DEA meant instead that after PDK's finished products reached the shelves of retail stores, someone might

buy (or steal) the ephedrine-containing pills and use them to make methamphetamine. In support of its judgment that "the chemical may be diverted," DEA described in the suspension orders four instances in 1994 and 1995 when PDK, by mail order, shipped large quantities of tablets containing ephedrine to individuals, some of whom were later arrested for manufacturing methamphetamine. The suspension orders also stated that PDK had exported its finished products to Canada without notifying DEA 15 days in advance, as the statute and regulations required; and that PDK products containing ephedrine and pseudoephedrine had been found at methamphetamine laboratories and "dumpsites," as reported in "warning letters" DEA sent to PDK. (DEA sometimes notifies manufacturers when their drug products are found at methamphetamine laboratories; these "warning letters" do not assign culpability to the manufacturer.)

PDK litigated the validity of the suspension orders before an Administrative Law Judge. After an evidentiary hearing, the ALJ ruled in PDK's favor, finding that there was no evidence that the shipments of ephedrine from Indace and Malladi might have been diverted to illegal uses. As to PDK's finished products – the pills sold over the counter in retail stores – the ALJ held that these were not "listed chemical[s]" within § 971's meaning even though they contained ephedrine. In the alternative, the ALJ held that DEA had not satisfied the "may be diverted" portion of § 971. The ALJ's reasoning was as follows. PDK is the largest manufacturer of generic List I chemical products sold in convenience stores. In 1998, for instance, PDK distributed approximately 10 million bottles of its combination ephedrine product; in the same year DEA warning letters indicated that 1,061 such bottles – about .01 percent of the total PDK distributed – had been seized at illicit sites. There was no evidence to show whether other manufacturers of ephedrine products had a lower or higher percentage. There was evidence that all ephedrine-containing medications, from whichever manufacturer, "may be diverted" in this manner. Even if retail stores limited a customer's purchases of these drugs, individuals

could simply buy the drugs from many different stores or steal them.

On DEA's exceptions to the ALJ's decision, the DEA Deputy Administrator sustained the suspension orders, ruling that § 971(c)(1)'s reference to "the chemical" encompassed not only the chemical to be imported – here ephedrine – but also products manufactured from the chemical. 67 Fed. Reg. 77,805, 77,806 (Dec. 19, 2002). In support of this interpretation, the Deputy Administrator invoked the definition of "regulated transaction" in 21 U.S.C. § 802(39)(A)(iv); the opinion in *United States v. Abdul Daas*, 198 F.3d 1167, 1175 (9th Cir. 1999); and a 1993 House Committee Report. 67 Fed. Reg. at 77,806. In finding that PDK's finished products "may be diverted," the Deputy Administrator recited warning letters given to PDK involving not only its combination ephedrine products but also its pseudoephedrine drugs, and other information contained in the suspension orders, but – agreeing with the ALJ – decided that PDK had not violated reporting requirements with respect to its mail order sales. *Id.* at 77,808-09.

The Deputy Administrator also relied on PDK's alleged export violations. *Id.* at 77,809. In 1994 and 1995 PDK sold ephedrine tablets to Sun Labs of Canada without notifying DEA in advance. The Deputy Administrator concluded that PDK thereby violated a regulation (21 C.F.R. § 1313.21) requiring exporters to give DEA notice 15 days in advance of each transaction in which a listed chemical is exported from the United States. Although the ALJ found that PDK had not exported the tablets, that it had sold the tablets and transferred ownership to Sun Labs in New York, and that there was no evidence the tablets were ever delivered to Canada, the Deputy Director ruled that PDK had failed to comply with the regulation because its president believed the tablets would eventually be shipped to Canada. 67 Fed. Reg. at 77,808.

The warning letters plus PDK's export violations led the Deputy Administrator, looking at what he called "the totality of the circumstances," to conclude that the suspension orders

should be sustained despite evidence that PDK had made significant efforts to prevent its finished products from being used illegally. *Id.* at 77,809.

## II.

There is no doubt that PDK suffered an injury when the shipments of ephedrine did not arrive; and that its injury could be redressed if we found the DEA orders invalid. While PDK thus has Article III standing to sue, *see Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38–39 (1976), DEA argues that the company lacks prudential standing.

In deciding whether a litigant has prudential standing, the court must identify what interest the litigant seeks to vindicate and then decide if that interest is "arguably within the zone of interests to be protected or regulated by the statute," *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). The test, which may be understood as a gloss on the judicial review provision of the Administrative Procedure Act (5 U.S.C. § 702), *see Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987), is not demanding. *See Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 444 (D.C. Cir. 1998) (en banc). The court "should not inquire" whether Congress intended to benefit or regulate the litigant. *Nat'l Credit Union Admin. v. First Nat'l Bank*, 522 U.S. 479, 488-89, 492 (1998). It is enough that the litigant's interest is "arguably" one regulated or protected by "the statutory provision at issue," *id.* at 492.

PDK's interest was in buying ephedrine and using it to manufacture drugs; the importers' interest was in selling the chemical to PDK. Although suspension orders are directed to importers, § 971(c)(1) necessarily regulated the interests not only of importers but also of their domestic customers. The point is so obviously clear and so clearly obvious that it is scarcely worth articulating – if an importer cannot ship a listed chemical, the domestic customer cannot receive it. PDK's interests are thus arguably, indeed more than arguably, within the zone of interests § 971(c)(1) regulates.

DEA's Deputy Director made the point in a related context: "the party in interest in this proceeding is the manufacturer-customer of the importer. It is the conduct of that party, PDK, and its customers, and the fact that the product which it manufactured and distributed ended up in clandestine drug laboratories, that forms the basis of the Government's contention that the ephedrine imported 'may be diverted.'" 67 Fed. Reg. at 77,806–07.

DEA argues against PDK's prudential standing on the basis of the following language from § 971(c)(2): "a regulated person to whom an order applies under paragraph (1) is entitled to an agency hearing on the record in accordance with" the Administrative Procedure Act. According to DEA, § 971(c)(2) entitles only the importer – as "a regulated person to whom [a suspension] order applies" – to an agency hearing on the validity of the order. There is no formal DEA ruling or regulation to this effect and the only judicial precedent on point is Judge Kennedy's decision, in an earlier phase of this case, ordering DEA to provide PDK with a hearing. *PDK Labs Inc. v. Reno,* 134 F. Supp. 2d 24, 31 (D.D.C. 2001). A "regulated person" is a "person who manufactures, distributes, imports, or exports a listed chemical, a tableting machine, or an encapsulating machine . . . ." 21 U.S.C. § 802(38). PDK is therefore "a regulated person." Judge Kennedy held that because the orders blocked shipments to PDK, the company is also someone "to whom an order applies," a result he thought consistent with *Yi Heng Enterprises Dev. Co.*, 64 Fed. Reg. 2234, 2235 (DEA Jan. 13, 1999) ("the statute provides the opportunity for a hearing to 'a regulated person to whom an order (suspending shipment) applies,' not necessarily the person to whom the order was issued."). *PDK Labs v. Reno,* 134 F. Supp. 2d at 30.

DEA's contrary argument – that under § 971(c)(2) only " 'a regulated person to whom an order applies *under paragraph 1*' is entitled to judicial review," and that only importers fit that description, Respondent's Br. at 20 – is wrong for several reasons. Very rarely has Congress withheld judicial review from those who have suffered an Article III injury at the hands of an administrative agency. *See Bowen v. Michigan*

*Acad. of Family Physicians*, 476 U.S. 667, 670-71 (1986). Time and again the Supreme Court has emphasized that there is a "strong presumption" in favor of judicial review, *id.* at 670, 672 n.3, and that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967); *see, e.g., Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 424-25 (1995); *Block v. Community Nutrition Inst.*, 467 U.S. 340, 349 (1984). We do not believe there is any such legislative intent here. Section 971(c)(2) is not itself a judicial review provision. It is instead a provision dealing with hearings before the agency. *See Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n*, 194 F.3d 72, 75-76 (D.C. Cir. 1999). One can envision a statutory system in which only those who may participate in agency proceedings are entitled to review in court. *Id.* The Supreme Court in *Block* so interpreted the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 *et seq.*, in holding that consumers could not bring actions for judicial review of the Agriculture Secretary's milk marketing orders. 467 U.S. at 347. But DEA concedes that even on its reading of § 971(c)(2), PDK could participate in an agency hearing challenging a suspension order, so long as the importer initiated the challenge (which neither Indace nor Malladi did). Respondent's Br. at 21. Furthermore, in *Block* the Court discerned several reasons why Congress would not have wanted consumers to bring judicial challenges to the marketing orders. 467 U.S. at 347-52. Here, it is hard to see any cogent reason why Congress would give importers a right to judicial review, but deny that right to their domestic customers who have as much to lose.

DEA tries to come up with such a reason: to avoid wasteful proceedings as when a customer succeeds in getting a suspension order vacated but the importer then decides not to go through with the deal. Respondent's Br. at 21. DEA apparently believes that the contractual arrangements between the parties would permit the importer to back out. We have no way of knowing if that is a customary way of doing this business; and DEA has provided nothing to indicate that

Congress thought it was. There is another problem with DEA's rationale. Everyone agrees that importers have a right to judicial review. Yet if the parties are free to cancel a deal, as DEA assumes, there is a risk that the customer will call it off after the importer wins in court and has the suspension order set aside. In other words, DEA's argument offers no rational distinction between importers, who may seek judicial review, and domestic customers, who DEA says cannot. In addition, the Deputy Director's ruling in PDK's case would preclude it from buying ephedrine from any importer. On his view, the suspension order rests on what may happen to the finished products after they leave PDK's facilities. No matter which importer sought to supply PDK, a suspension order presumably would issue. A ruling against the validity of the orders in this case, far from being an academic exercise, therefore has practical future consequences for PDK even if Indace or Malladi cancel their deals.

As to the judicial review provision of the Controlled Substances Act, 21 U.S.C. § 877, this gives no indication that Congress meant to grant judicial review to importers but to withhold it from their domestic customers. Section 877 merely provides, in familiar language, that "any person aggrieved" by a final DEA decision is entitled to judicial review in the court of appeals. While statutory language and legislative history may overcome the presumption in favor of judicial review, *see Block*, 467 U.S. at 349, there is no language in § 877 and no legislative history DEA has cited that accomplishes that here. In view of the interpretation of statutes applicable to other agencies containing language identical to § 877, we hold that if PDK has Article III standing, which no one doubts, and if its interests are "arguably within the zone of interests" § 971(c)(1) regulates, which we believe they are, PDK is a "person aggrieved" within § 877's meaning and is entitled to prosecute its case in court. *See, e.g., Director, Office of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 126-27 (1995)*; New World Radio, Inc. v. FCC*, 294 F.3d 164, 169 (D.C. Cir. 2002); *Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 366 (D.C. Cir. 1998).

In holding that PDK has prudential standing, we have avoided placing a judicial interpretation on § 971(c)(2), the hearing provision. As we have said, DEA has not yet rendered any formal interpretation of this provision. *Compare Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1977), with *Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n*, 194 F.3d at 75-76. There will be time enough to consider whatever construction DEA ultimately places on the provision. In the meantime, companies in PDK's position have prudential and Article III standing to challenge suspension orders, which themselves must contain "a statement of the legal and factual basis" for the order, 21 U.S.C. § 971(c)(1). *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971).

### III.

To repeat, § 971(c)(1) authorizes DEA to "order the suspension of any importation . . . of a listed chemical . . . on the ground that the chemical may be diverted to the clandestine manufacture of a controlled substance." The main interpretive question in the case is whether, as the suspension orders assume, "the chemical may be diverted" includes the prospect that PDK's ephedrine-containing pills in retail stores will be sold to, or shoplifted by, people who will then use the pills to produce methamphetamine.[1] The Deputy Administrator concluded that the statute plainly meant what the suspension orders assumed. He reached this conclusion without mentioning any policy considerations or other matters within the

---

[1] The concurring opinion severs "chemical" from "diverted," and then treats each word as if it should be construed in isolation. But the correct approach is to take the language of § 971(c)(1) in its entirety, rather than trying to construe each word separately. *See, e.g., Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809-10 (1989); *United States v. Morton*, 467 U.S. 822, 828 (1984). It is true that one must comprehend the words in a statute in order to comprehend the statute, just as one must comprehend the letters in a word in order to comprehend the word. But it is equally true that one cannot understand a statute merely by understanding the words in it.

agency's expertise. Apparently for this reason, DEA neither invokes *Chevron v. NRDC*, 467 U.S. 837, 843-45 (1984), nor asks us to give any special deference to the Deputy Administrator's judgment about the meaning of the provision. *See, e.g., Prill v. NLRB*, 755 F.2d 941, 956-57 (D.C. Cir. 1985); *Alarm Indus. Communications Comm. v. FCC*, 131 F.3d 1066, 1072 (D.C. Cir. 1997); *Transitional Hosps. Corp. v. Shalala*, 222 F.3d 1019, 1028-29 (D.C. Cir. 2000); *ITT Indus., Inc. v. NLRB*, 251 F.3d 995, 1004 (D.C. Cir. 2001); *Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002).

As one of his reasons for thinking the statute clear, the Deputy Administrator cited "the legislative history of the Chemical Diversion Control Act of 1993, Public Law 103-200, § 9, 107 Stat. 2333 (1993)," and stated that this legislation was meant "to close the 'loophole' for those who divert ephedrine drug products." 67 Fed. Reg. at 77,806. Congress enacted § 971(c)(1) in 1988, but the House Report the Deputy Administrator cited came out five years later, in 1993. In all cases, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," *United States v. Price*, 361 U.S. 304, 313 (1960), and have "very little, if any, significance." *Rainwater v. United States*, 356 U.S. 590, 593 (1958). In this case, the "basis" is "hazardous" indeed.[2] The

[2] The concurring opinion, like the Deputy Administrator, relies heavily on this legislation and its history, treating it as "significant" because it altered the definition in § 802(39) of "regulated transactions." Concurring op. at 7 & 10. But the 1993 amendments did not amend the language at issue here. How the 1993 amendments "changed the reach" of § 971(1)(c), as the concurrence supposes (at 12 n.6), thus remains a mystery. Section 971(c)(1) did not give DEA authority to suspend "regulated transactions." The authority Congress conferred in 1988 was and is limited to suspending importations or exportations of listed chemicals. Such importations and exportations are a subset of "regulated transactions" as § 802(39)(A) defines the term. To say that other regulated transactions are included in § 971(c)(1) is simply to restate the question in the case.

As to the 1996 legislation, which the concurrence also invokes, it too did not alter § 971(c)(1) and neither the DEA Deputy Adminis-

"loophole" mentioned in the House Report did not deal with the importation of listed chemicals; it dealt instead with domestic reporting and record keeping relating to finished products. The Report explained the purpose of the legislation: "to provide authority to [DEA] to require that manufacturers of ephedrine products sold over-the-counter maintain transaction records." H.R. REP. NO. 103-379, pt. 1, at 5 (1993). If this later statute and its history had any bearing on the meaning of § 971(c)(1), it would tend to support PDK, not DEA. The Chemical Diversion Control Act of 1993 drew a distinction between, on the one hand, the finished product and, on the other hand, the listed chemical. Thus, § 814(a) provides that DEA may remove a "drug or a group of drugs" containing "a listed chemical" from the exemption for reporting. 21 U.S.C. § 814(a). And § 814(e), which specifically relates to ephedrine, gave DEA authority to reinstate the exemption if it found that "the drug product" was "manufactured and distributed in a manner that prevents diversion." *Id.* § 814(e). One might say, therefore, that in the view of a later Congress it is PDK's "drug" or "drug product," not the "listed chemical" mentioned in § 971(c)(1), that is being diverted. The same may be said of § 802(39)(A)(iv)(I)(aa), on which the Deputy Administrator also relied. 67 Fed. Reg. at 77,806. This provision also resulted from the 1993 legislation and it too speaks in terms of "the drug" containing ephedrine rather than, as in § 971(c)(1), simply "a listed chemical" or "the chemical."

Current DEA regulations are to the same effect. The regulations, in defining a "regulated transaction," distinguish between a "drug contain[ing] ephedrine" and "a listed chemical." 21 C.F.R. § 1300.02(b)(28)(i)(D)(1). "The term combination ephedrine product means a drug product containing ephedrine . . . ." 21 C.F.R. § 1300.02(b)(32). And when referring to the type of diversion the Deputy Administrator had in mind in this case, the regulations speak not of the diversion of the listed chemical, but of the diversion of "the drug or

---

trator, in his reasons for interpreting § 971(c)(1) to cover shipments of bulk ephedrine, nor the government in its brief, relied on it.

group of drugs . . . to obtain the listed chemical for use in the illicit production of a controlled substance," 21 C.F.R. § 1300.02(b)(28)(i)(D)(1)(ii). The 1993 amendment uses the identical language. 21 U.S.C. § 802(39)(A)(iv)(I)(bb).

The Deputy Administrator also thought that § 971(c)(1)'s meaning was plain in light of the decision of the Ninth Circuit in *United States v. Daas*, 198 F.3d 1167, 1175 (1999), which he described as holding that the "plain meaning" of "listed chemical" encompasses ephedrine contained in finished products. 67 Fed. Reg. at 77,806. *Daas* was a criminal case. The defendant sold decongestants containing ephedrine to convenience stores knowing the drugs would be used to manufacture methamphetamine. The court sustained his conviction for violating what is now 21 U.S.C. § 841(c)(2). Section 841(c)(2) states that anyone who "possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance" is guilty of an offense. In an analysis the Deputy Administrator adopted, 67 Fed. Reg. at 77,806, the court held that because ephedrine did not change its chemical composition when mixed with other ingredients to form decongestants, it was plain that the defendant was distributing "a listed chemical" when he sold decongestants to retail stores. 198 F.3d at 1174-75.

There is logic in the Ninth Circuit's reasoning, and in the Deputy Administrator's reliance on the decision. When Congress uses the same word in different parts of a statute, it usually means the same thing. *See Sullivan v. Stroop,* 496 U.S. 478, 484 (1990); *Energy Research Found. v. Defense Nuclear Safety Bd.*, 917 F.2d 581, 583 (D.C. Cir. 1990). But statutory interpretation is not just about logic. *See* Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, in BENCHMARKS 213 (1967). The words of the statute should be read in context, the statute's place in "the overall statutory scheme" should be considered, and the problem Congress sought to solve should be taken into account. *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 809 (1989). As to the last, we know that when § 971(c)(1) was enacted in 1988, the problem Congress addressed – at least

with respect to ephedrine – was not the misuse of finished products at the retail level. (Section 841(d)(2), the statute at issue in *Daas*, was also part of the 1988 amendments.) The problem instead was, as the Deputy Administrator stated in his opinion here, the diversion of imported bulk ephedrine to illegal uses. 67 Fed. Reg. at 77,807. It was only years later, after amendments to provisions other than § 971(c)(1), that the use of ephedrine-containing pills to make methamphetamine became widespread. This is at least some indication that Congress, in § 971(c)(1), did "not directly address[ ] the precise question at issue" in this case. *Chevron*, 467 U.S. at 843.

In saying this we recognize that the "fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991). But we do not agree that the language of § 971(c)(1) *plainly* covers the diversion of finished products, or drug products. That a statute is susceptible of one construction does not render its meaning plain if it is also susceptible of another, plausible construction, as we believe this statute is. Section 971(c)(1) deals with importation (and exportation) of listed chemicals. It does not regulate what a drug manufacturer does with the chemical after receiving it; other sections of the Act control that subject. When § 971(c)(1) states that DEA may stop the importation if "the chemical may be diverted to the clandestine manufacture of a controlled substance," one might ask: "Diverted from what?" In context, a reading as plausible as the Deputy Administrator's is that Congress meant only to cover diversions during importation. On this view, § 971(c)(1) would authorize suspension orders only if the imported chemical might not reach its intended destination – the legitimate, domestic manufacturer.[3]

_____

[3] The concurring opinion states that § 971(c)(1) "contains no words of limitation." Concurring op. at 3, 8. That of course assumes the issue. If "the chemical may be diverted" means only diversion of ephedrine *away from* the manufacturer during importa-

One other consideration deserves mention. The evidence in this case showed that *all* ephedrine-containing pills, *no matter who manufactures them*, may be used to make meth-amphetamine, and that every company producing drugs containing List I chemicals has had its products diverted from the legitimate treatment of illnesses to illegal uses. It follows that under the Deputy Administrator's reading of § 971(c)(1), DEA would have blanket authority to prevent the importation of ephedrine to any domestic manufacturer. Indications are that PDK could obtain bulk ephedrine only from overseas suppliers. Yet no one doubts that Congress did not intend to ban, or to give DEA the authority to ban, all sales of ephedrine-containing drugs in retail stores. DEA itself has acknowledged "Congress' intent that public access to the [ephedrine-containing] products at the retail level be protect-ed. . . ." 62 Fed. Reg. 52,253, 52,254 (DEA Oct. 7, 1997).

The Deputy Administrator attempted to avoid this problem by relying on *Mediplas Innovations*, 67 Fed. Reg. 41,256 (DEA June 17, 2002), and its "totality of circumstances" analysis to define "may be diverted." 67 Fed. Reg. at 77,807. This kitchen-sink approach allows "consideration of the widest possible range of relevant evidence," without quantifying the relative weight to be given to any particular consideration. *Mediplas Innovations*, 67 Fed. Reg. at 41,261. DEA may thus consider the quantity of a manufacturer's drugs identified in DEA warning letters without determining whether competing manufacturers, whose importations were not suspended, had a comparable percentage of their products diverted. DEA may also take into account the extent to which the manufacturer has complied with DEA regulations requiring timely filing of certain forms, *id.* at 41,262, its efforts to cooperate with DEA, *id.* at 41,264, and other

---

tion, the statute does indeed contain words of limitation. The dictionary definition of "divert" cited in the concurrence lends further support to the plausibility of this interpretation. Concurring op. at 4. We do not say that this is the only possible interpretation of § 971(c)(1). Our point instead is that the statute's meaning is not as clear as the DEA Deputy Administrator made it out to be.

matters. The wide range of factors DEA used in *Mediplas,* and in this case, to give meaning to "the chemical may be diverted" language of § 971(c)(1) seems hardly the stuff of plain meaning.

In short, we do not agree that the meaning of § 971(c)(1) is as plain as DEA says it is. It may be that here, as in other cases, the strict dichotomy between clarity and ambiguity is artificial, that what we have is a continuum, a probability of meaning. In precisely those kinds of cases, it is incumbent upon the agency not to rest simply on its parsing of the statutory language.[4] It must bring its experience and expertise to bear in light of competing interests at stake. *See Chevron v. NRDC*, 467 U.S. at 865-66. When it does so it is entitled to deference, so long as its reading of the statute is reasonable. But it has not done so here and at this stage it is not for the court "to choose between competing meanings." *Alarm Indus. Communications Comm. v. FCC*, 131 F.3d at 1072; *see, e.g., Prill v. NLRB*, 755 F.2d at 956-57; *Transitional Hosps. Corp. v. Shalala*, 222 F.3d at 1028-29; *ITT Indus., Inc. v. NLRB*, 251 F.3d at 1004; *Arizona v. Thompson*, 281 F.3d at 254.

In trying to distinguish the *Prill* line of decisions, the concurring opinion states that unlike those cases, here "[w]e know how the agency would choose to interpret the statute" on remand. Concurring op. at 16. We know no such thing. Yes, DEA did exercise discretion when it issued the order here, but before doing so it necessarily had to decide what § 971(c)(1) meant. That is the issue the agency must reconsider on remand. In addition, it is important to remember

---

[4] The concurring opinion assumes that the so-called *Chevron* "step 1" is limited to determining whether the statute has a plain meaning. Concurring op. at 13. But in deciding whether Congress directly addressed a particular issue (step 1), one may use "the traditional tools of statutory construction." 467 U.S. at 843 n.9; *see, e.g., Am. Bankers Ass'n v. Nat'l Credit Union*, 271 F.3d 262, 271 (D.C. Cir. 2001). This is all the DEA Deputy Administrator did, and it is all that we have done in examining the language and context of § 971(c)(1).

that if we find that an agency's stated rationale for its decision is erroneous, we cannot sustain its action on some other basis the agency did not mention. *See SEC v. Chenery Corp.*, 332 U.S. 194, 200 (1947). The law of this circuit requires in those circumstances that we withhold *Chevron* deference and remand to the agency so that it can fill in the gap. As we held in *Arizona v. Thompson*, 281 F.3d at 254, deference to an agency's interpretation of a statute is not appropriate when the agency wrongly "believes that interpretation is compelled by Congress." *See, e.g., ITT Indus., Inc. v. NLRB*, 251 F.3d at 1004; *Transitional Hosps. Corp. v. Shalala*, 222 F.3d at 1028-29; *Alarm Indus. Communications Comm. v. FCC*, 131 F.3d at 1072.

Even if § 971(c)(1) plainly meant what DEA thought, we would still have to vacate the Deputy Administrator's decision and remand the case.[5] In applying his "totality of circumstances" approach to determining whether the listed chemical may be diverted, the Deputy Administrator ruled that PDK had violated an export notification regulation when it made four deliveries of tablets containing ephedrine between 1994 and 1995 to Sun Labs of Canada in New York. 67 Fed. Reg. at 77,807-08. The Deputy Administrator did not explain how alleged export violations were relevant to determining whether PDK's finished products might be used in methamphetamine laboratories. In any event, the Deputy Administrator failed to distinguish, indeed did not mention, *Alfred Khalily, Inc.*, 64 Fed. Reg. 31,289 (DEA June 10, 1999), which held that a company selling List I chemicals to a foreign buyer but delivering the chemicals to the buyer in the United States

---

[5] We do not understand the complaint in the concurring opinion that we should have disposed of this case solely on this basis, without saying anything about the Deputy Administrator's interpretation of § 971(c)(1). Giving several, separate reasons for reversing and remanding is a time-honored, prudent mode of appellate jurisprudence, *see, e.g., Erie R.R. v. Tompkins*, 304 U.S. 64, 72-73, 77-79 (1938); *Kleppe v. Sierra Club*, 427 U.S. 390, 403-06 (1976). So here. DEA should have our opinion on the statutory construction issue so that it may deal with that issue now, rather than later if PDK seeks judicial review of DEA's decision on remand.

"was not responsible for filing any export documentation." *Id.* at 31,293 n.2. *Khalily* could not have escaped the Deputy Administrator's attention; the ALJ had cited it in her opinion. An agency may of course alter its positions over time, but the "agency acts arbitrarily when it departs from its precedent without giving any good reason." *Northern California Power Agency v. FERC,* 37 F.3d 1517, 1522 (D.C. Cir. 1994). DEA recognizes as much and confesses that the Deputy Administrator erred in failing to reconcile his ruling with *Khalily.* But, DEA continues, this is of no moment because the result of the agency proceedings would not have changed.

In administrative law, as in federal civil and criminal litigation, there is a harmless error rule: § 706 of the Administrative Procedure Act, 5 U.S.C. § 706, instructs reviewing courts to take "due account . . . of the rule of prejudicial error." If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration. But in this case we cannot say that the Deputy Administrator's error was of that sort. It is entirely possible that, on remand, he will decide to adhere to *Khalily*, in which event PDK will be exonerated from any export violations. The Deputy Administrator stated that it was "the totality of circumstances" that led him to sustain the suspension orders, and four of the "circumstances" prominently mentioned were PDK's export violations. 67 Fed. Reg. at 77,807. What weight he gave to those circumstances (or any others) is impossible to discern. The decision upholding the suspension orders must therefore be set aside and the case remanded.

*So ordered.*

ROBERTS, *Circuit Judge*, concurring in part and concurring in the judgment:

I agree with the majority that PDK has standing to seek review of DEA's suspension order, and that the order must be vacated because it relies, in significant part, upon a conclusion that PDK violated certain export notification regulations — a conclusion that contradicted relevant agency precedent without explanation. This much is not terribly controversial; DEA conceded its error and all but conceded that this court should remand the decision on that basis. *See* DEA Br. 59 ("we acknowledge that, in such circumstances, the ordinary practice would be a remand to the agency"). This is a sufficient ground for deciding this case, and the cardinal principle of judicial restraint — if it is not necessary to decide more, it is necessary not to decide more — counsels us to go no further.

My brethren, however, are not content with this narrow and effectively conceded basis for disposition, and instead adopt an alternative ground of far broader significance, one that precipitates disagreement among us but at the end of the day leads to the same result — vacatur and remand to the agency. I cannot go along for that gratuitous ride.

\* \* \*

The majority's alternative basis for remand sidesteps the familiar *Chevron* analysis, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843–45 (1984), substituting in its stead an argument in three parts: (1) the Deputy Administrator thought the plain meaning of Section 971 gave him discretion to suspend importation in this case, (2) Section 971 has no plain meaning but is in fact susceptible of different interpretations on the question presented, and (3) the case must therefore be sent back so that the Deputy Administrator can decide which construction he thinks is right (as opposed to compelled) and explain why.

This reasoning fails at each step, and each defect is fatal to the majority's analysis. First, Section 971(c)(1) is not ambiguous, and the Deputy Administrator's interpretation in this case is entirely consistent with the clearly expressed intent of

Congress. Second, the Deputy Administrator's decision cannot fairly be read as reflecting the view that he felt compelled to read the statute as he did, as opposed to simply adopting the construction that seemed most reasonable to him, and explaining his reasons for that. Finally, even if Section 971 were ambiguous, and even if the Deputy Administrator erroneously rested his decision only on a plain reading of the statute, a remand still would not be necessary. We know how the agency would construe the statute, because its interpretation in this case was reached in the course of a purely discretionary act. If the agency did not want to block this importation, nothing in Section 971(c) required it to do so. This is hardly a case — like those cited by the majority — in which the agency felt it was forced to take the action it did, based on an erroneous reading of the law.

1. I would uphold the agency's interpretation of Section 971 under step one of *Chevron*. Congress has "directly addressed the precise question at issue," and the Deputy Administrator's position is entirely consistent with the "unambiguously expressed intent of Congress" on this subject. *Chevron*, 467 U.S. at 843.

"We turn first, as we must, to the language of the statute, the most important manifestation of Congressional intent." *Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 662 (D.C. Cir. 2003) (quotation omitted). The language in question: "The Attorney General may order the suspension of any importation or exportation of a listed chemical . . . on the ground that the chemical may be diverted to the clandestine manufacture of a controlled substance." 21 U.S.C. § 971(c)(1). Ephedrine is a "listed chemical" under the statute. *See* 21 U.S.C. § 802(34)(C); *id.* § 951(b) (applying definitions from Section 802 to Controlled Substances Import and Export Act, 21 U.S.C. §§ 951–971). Thus, under Section 971(c)(1), the Attorney General may order the suspension of any importation of ephedrine on the ground that the ephedrine, if imported, may be diverted to the clandestine manufacture of a controlled substance. *See* 21 C.F.R. § 1313.41 (providing that DEA may suspend a shipment of a

listed chemical "based on evidence" that the chemical may be diverted).

The statute contains no words of limitation. Any probability of diversion of any amount of ephedrine is a sufficient statutory basis for the invocation of the Attorney General's authority. This is, to be sure, an expansive delegation of power. When faced with similarly broad grants of authority to the Executive, we have noted that "the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003). So here.

a. "Listed chemical." The majority primarily takes issue with the Deputy Administrator's conclusion that the term "listed chemical" can include PDK's over-the-counter drug products containing ephedrine. *See* Maj. Op. at 10–14; 67 Fed. Reg. at 77,806. The majority explains that a drug containing a listed chemical is not the same as a listed chemical, and that the statute recognizes this distinction. Fair enough. What the majority fails to acknowledge, however, is that it is not PDK's "MaxBrand Mini Two–Way Action" product (obviously itself not a "listed chemical," but a "chemical mixture," *see* 21 U.S.C. § 802(40)) that is regularly diverted to the manufacture of methamphetamine, but rather the 25 mg of ephedrine that each Mini Two–Way Action pill contains.

Once it receives its bulk ephedrine, PDK combines the ephedrine with the decongestant guaifenesin and binders to form its Mini Two–Way Action pills. *See* PDK Br. 4. Throughout this process, the chemical composition of the ephedrine is unaltered. Illicit methamphetamine manufacturers then purchase or steal Mini Two–Way Action, and break the finished product back down into its component parts, yielding exactly the same pure ephedrine that was imported by PDK. *See* ALJ Op. ¶¶ 90–91. It is that imported ephedrine that is "diverted" — *i.e.*, turned away from its intended destination or use, *see infra* at 4–5 — to the manufacture of methamphetamine. In this manner, it is the listed chemical itself — ephedrine — that is diverted to methamphetamine

manufacturing. At the time of its "diversion," the ephedrine extracted from PDK Mini Two–Way Action is just as much a listed chemical as when it was transported across the high seas in bulk form. Thus, at least insofar as a listed chemical is readily extractable from its finished drug product, the text of Section 971(c) treats transactions (including a "diversion") in that drug as transactions in the listed chemical it contains.

This interpretation comports with common sense. If a methamphetamine manufacturer steals, for the purpose of making methamphetamine, a bottle containing pure ephedrine, or pure ephedrine dissolved in water, or a bottle containing 50 ephedrine pills and 50 guaifenesin pills, we would not hear an argument that he did not divert a listed chemical because he also diverted a bottle, some water, or some guaifenesin. The presence of packaging materials or other extraneous items does not vitiate the existence of the listed chemical. Here, a bottle of PDK Mini Two–Way Action contains pills each consisting of 25 mg of ephedrine and 200 mg of guaifenesin and binders. For purposes of Section 971(c), the decongestant and the binders are extraneous materials, no more relevant to the analysis than the bottles and boxes in which the pills are packaged.

b. "May be diverted." The majority also finds ambiguity in the term "may be diverted." I do not.

Although PDK did not object here or below to DEA's construction of the term "diverted," the majority suggests that, given the focus of Section 971 on imports and exports, the term may only cover hijackings during the import or export. *See* Maj. Op. at 14. Such a crabbed construction is untenable. First, it conflicts with the plain meaning and common usage of the verb. The *Oxford English Dictionary* defines "divert" to mean "[t]o turn aside (a thing, as a stream, etc.) from its (proper) direction or course; ... to turn *from* one destination or object *to* another." IV OXFORD ENGLISH DICTIONARY 888 (2d ed. 1989); *see also* BLACK'S LAW DICTIONARY 491 (7th ed. 1999) (defining "diversion" as "[a] deviation or alteration from the natural course of things"). That the term

is broad does not make it ambiguous. *See Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980) ("Broad general language is not necessarily ambiguous when congressional objectives require broad terms."). The majority asks "[d]iverted from what?," Maj. Op. at 14, but Congress did not choose to limit the statute along any such lines.[1]

Moreover, the word "diversion" appears throughout both the statute that initially enacted Section 971, the Chemical *Diversion* and Trafficking Act of 1988 (CDTA), Pub. L. No. 100–690, §§ 6051 *et seq.*, 102 Stat. 4181, 4312, and the statute that expanded the CDTA's reach to cover many finished drug products containing ephedrine, the Domestic Chemical *Diversion* Control Act of 1993 (DCDCA), Pub. L. No. 103–200, 107 Stat. 2333. There is, of course, a strong presumption that "identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (quotation omitted), and in no section of either the CDTA or the DCDCA is the term "diversion" used in the limited sense the majority speculates it might have been used in Section 971.[2]

The majority also contends that the "totality of the circumstances" standard applied by DEA in explaining its decision to suspend importation in this case, *see* 67 Fed. Reg. at 77,807; *In re Mediplas Innovations*, 67 Fed. Reg. 41,256,

---

[1] The majority asserts that "[i]f 'the chemical may be diverted' means only diversion of ephedrine *away* from the manufacturer during importation, the statute does indeed contain words of limitation." Maj. Op. at 14–15 n.3 (emphasis in original). No. The majority can choose to read the words "away from the manufacturer during importation" *into* the statute, but it cannot claim that the statute *contains* those words of limitation.

[2] The majority says I err by considering "listed chemical" apart from "may be diverted." *See* Maj. Op. at 10 n.1. I took my cue, of course, from Congress, which treated "listed chemical" as a separately defined term in the statute. *See* 21 U.S.C. § 802(33)–(35). And I do not see any significant difference between asking whether a "listed chemical" "may be diverted" and whether a "listed chemical may be diverted."

41,262 (2002), "seems hardly the stuff of plain meaning." Maj. Op. at 16. Noting that all ephedrine-containing drugs are diverted to some extent, the majority complains that DEA's "kitchen-sink approach" could potentially permit DEA to ban ephedrine-containing drugs altogether. *Id.* at 15–16. This criticism confuses the grant of discretion with review for abuse. There is nothing unusual about a statute granting an agency broad discretion — plainly or otherwise — and the agency developing standards that govern the exercise of that discretion on a case-by-case basis, through adjudication rather than rulemaking. *See*, *e.g.*, *INS v. Aguirre–Aguirre*, 526 U.S. 415, 429 (1999); *Chippewa & Flambeau Improvement Co. v. FERC*, 325 F.3d 353, 359 (D.C. Cir. 2003). Over time, that will result in an effective and salutary narrowing of the discretion enjoyed by the agency. *See* HENRY J. FRIENDLY, *More Definite Standards of Administrative Action: The Need*, in BENCHMARKS 86, 97 (1967) ("[W]here the initial standard is thus general, it is imperative that steps be taken over the years to define and clarify it — to canalize the broad stream into a number of narrower ones."). That process hardly belies the original broad grant of discretion.

c. Legislative history. Although we have been instructed not to "resort to legislative history to cloud a statutory text that is clear," *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994); *accord Air Transport Ass'n of Canada v. FAA*, 323 F.3d 1093, 1096 (D.C. Cir. 2003) ("ordinarily, we do not read legislative history to *create* otherwise non-existent ambiguities"), the majority relies upon legislative history to such an extent that a response seems in order. The majority's main point is that Congress was not concerned about diversion of finished ephedrine-containing products in 1988, when Section 971 was enacted. *See* Maj. Op. at 11–12. Even if true, the Supreme Court has held often enough that "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001) (internal quotation marks and citation omitted); *accord Consumer Elecs. Ass'n*, 347 F.3d at 298.

Moreover, as the Deputy Administrator recognized — and as will be demonstrated below — the history that is significant is the history of the DCDCA and its sibling Comprehensive Methamphetamine Control Act of 1996 (CMCA), Pub. L. No. 104–237, 110 Stat. 3099, for those are the statutes that broadened the ambit of the regulation of listed chemicals — including under Section 971 — to cover drugs containing ephedrine. As noted by the Deputy Administrator, that legislative history clearly demonstrates that Congress was very much concerned about the diversion of finished drug products containing ephedrine. *See* H.R. REP. NO. 103–379, at 6 (1993) ("This provision removes the exemption . . . for drugs containing ephedrine . . . because these products are being diverted in significant quantities for the illicit manufacture of methamphetamine").

The majority also complains that the "loophole" cited by the Deputy Administrator in his decision bears no relationship to Section 971, because it dealt only with "reporting and record keeping relating to finished products." Maj. Op. at 12. The majority is half right; the "loophole" in question did concern reporting and record keeping requirements. Of course, Section 971 is, first and foremost, a reporting requirement, and it is primarily the reporting that alerts the Attorney General to an importation that might be suspended. *See* 21 U.S.C. § 971(a). More importantly, the Deputy Administrator cited two references in the committee report in discussing the "loophole," *see* 67 Fed. Reg. at 77,806, and the second — the one ignored by the majority — offered a more detailed description of the problem in question. The second reference was to the DEA Acting Administrator's explanation that "the so-called 'legal drug exemption' which currently exempts drug products approved for marketing under the Food, Drug and Cosmetic Act from the regulatory provisions of our chemical control law" had become a "loophole," "exploited by clandestine laboratory operators." H.R. REP. NO. 103–379, at 8. It is that loophole that the DCDCA and CMCA revoked for drugs containing ephedrine, *see* 21 U.S.C. § 802(39)(A)(iv)(I)(aa), but which the majority's proffered reading would restore for purposes of Section 971.

\* \* \*

For all these reasons I would uphold the agency's interpretation of Section 971 under step one of *Chevron*. The broad language unambiguously confers discretion to suspend the importation at issue because the ephedrine in PDK's products may be diverted to methamphetamine production, and nothing in the legislative history remotely suggests — let alone compels — a narrower reading.

2. The majority, however, concludes that the statute is ambiguous. But my colleagues refuse to proceed — as we ordinarily would in such circumstances — to *Chevron*'s second step, and ask whether the agency's interpretation "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.[3] Rather, they contend that a remand is

---

[3] Not to chase down every rabbit spooked by the majority's alternative holding, but the fact that DEA did not, as the majority notes, request "any special deference to the Deputy Administrator's judgment about the meaning of the provision," Maj. Op. at 11, would seem to be without consequence. DEA is clearly entitled to *Chevron* deference — it has been delegated the authority both to issue legislative rules and to engage in binding adjudications under the statute, either of which triggers the applicability of *Chevron*. *See* Thomas W. Merrill & Kristin E. Hickman, Chevron*'s Domain*, 89 GEO. L. J. 833, 900–01 (2001). We have never held that an agency must mouth magic words before we will apply the deference required by a congressional delegation of authority to the agency. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001) (Easterbrook, J.) ("Federal courts are entitled to apply the right body of law, whether the parties name it or not."). Moreover, DEA's reticence on this score is understandable. The terms at issue here are more typically implicated in criminal prosecutions to which *Chevron* does not apply. It is not difficult to see why DEA would prefer not to invite a holding from this court that is predicated on a conclusion that those terms are ambiguous.

required, citing *Prill v. NLRB*, 755 F.2d 941 (D.C. Cir. 1985), and its progeny.

The *Prill* line of cases stands for the proposition that when an agency reads a statute in a particular way based on the erroneous belief that the reading was mandated by the statute (and thus the agency had no latitude to adopt a different interpretation), the case will be remanded so that the agency — now freed from its confined view of its own discretion — can reconsider its interpretation of the statute. *See Prill*, 755 F.2d at 947–48, 950–53. Here, the majority claims that "[t]he Deputy Administrator . . . thought that § 971(c)(1)'s meaning was plain," Maj. Op. at 13; *see also id.* at 10 ("The Deputy Administrator concluded that the statute plainly meant what the suspension orders assumed."); *id.* at 16 ("we do not agree that the meaning of § 971(c)(1) is as plain as DEA says it is"); and that "[h]e reached this conclusion without mentioning any policy considerations or other matters within the agency's expertise," *id.* at 10–11; *see also id.* at 16 ("[I]t is incumbent upon the agency not to rest simply on its parsing of the statutory language. It must bring its experience and expertise to bear in light of competing interests at stake. . . . [I]t has not done so here.").

That is not how I read the Deputy Administrator's decision. There is nothing here to suggest that the Deputy Administrator thought he was under *Chevron* step one as opposed to step two, or that he thought of *Chevron* at all. *Compare, e.g., Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002) ("In *Chevron* terms, then, the agency has stopped at step one: HHS believes that the statute clearly bars primary program allocation, and that it is without discretion to reach another result."). Contrary to the majority's opinion, the Deputy Administrator did not state that the meaning of the statute is "plain." He also never used words like "unambiguous" or other phrases evocative of *Chevron* step one, such as "directly spoken to the precise question at issue." Instead, he said the critical language "must be construed" in light of other statutory language he considered relevant, distinguished three cases relied on by the ALJ, found "additional support" in a court of appeals case interpreting a related criminal statute,

discussed a House Report, and rejected the ALJ's policy concern that the government's view would create "strict liability." 67 Fed. Reg. at 77,806–07. Hardly the stuff of a plain language reading.

The Deputy Administrator's interpretation of Section 971 rested primarily on the theory that the scope of Section 971 must be understood in light of the term "regulated transaction," as defined in Section 802(39). *See id.* at 77,806; *see also* 21 U.S.C. § 951(b). This was the lead-off argument he made in defending his statutory reading.

It is a structural argument that leans heavily on the history of the listed chemical statutes. The CDTA, of which Section 971 was a part, *see* CDTA § 6053, 102 Stat. at 4314, generally widened the reach of the Nation's drug laws to include precursor chemicals — *i.e.,* chemicals used to manufacture controlled substances. In the section immediately following that which enacted Section 971, the CDTA also amended Section 802 of the Controlled Substances Act to provide definitions for the terms "listed chemical," "regulated person," and "regulated transaction." *See* CDTA § 6054(3), 102 Stat. at 4316 (codified at 21 U.S.C. § 802(34), (38), (39)). These terms have application not only in Section 971, but throughout the CDTA and its amendments — that is, in all the laws concerning the regulation of listed precursor chemicals.

At the time of the enactment of Section 971 in 1988, "regulated transaction" included imports and exports of listed chemicals — including ephedrine — but exempted "any transaction in a listed chemical that is contained in a drug that may be marketed or distributed lawfully in the United States under the Federal Food, Drug, and Cosmetic Act." 21 U.S.C. § 802(39)(A)(iv) (1989). Similarly, Section 802(39)(A)(v) exempted transactions "in a chemical mixture," defined as "a combination of two or more chemical substances, at least one of which is not a [listed chemical]." *Id.* § 802(39)(A)(v), (40). Thus, Section 802 specifically excluded all FDA-approved drug products and all chemical mixtures from the definition of "regulated transaction," and, concomitantly, from coverage under the CDTA, including Section 971.

Illegal methamphetamine manufacturers soon exploited this loophole. In 1993 and 1996, Congress responded by adding exceptions to its exception for FDA-approved drugs, effectively eliminating the exception for transactions in any "drug [that] contains ephedrine." *See* DCDCA § 2(a)(6)(C), 107 Stat. at 2333–34 (removing exception for a drug containing ephedrine and "therapeutically insignificant quantities of another active medicinal ingredient"); CMCA § 401(a)(1), 110 Stat. at 3106–07 (codified as amended at 21 U.S.C. § 802(39)(A)(iv)(I)(aa)) (removing exception for any drug containing ephedrine, regardless of whether it contained other therapeutic ingredients).[4] The DCDCA and the CMCA thus eliminated any exception for ephedrine-containing drugs from the definition of "regulated transaction." Because only listed chemical transactions qualify as "regulated transactions," *see* 21 U.S.C. § 802(39)(A), the re-inclusion of transactions in ephedrine-containing drugs reflects congressional intent that transactions in those drugs be treated as transactions in listed chemicals.[5] As the Deputy Administrator explained in expressly adopting the government's reasoning along these

---

[4] The DCDCA also limited the exception for chemical mixtures to those found by the Attorney General to be "formulated in such a way that it cannot be easily used in the illicit production of a controlled substance and that the listed chemical or chemicals contained in the mixture cannot be readily recovered." *See* DCDCA § 2(a)(6)(D), 107 Stat. at 2334 (codified at 21 U.S.C. § 802(39)(A)(v)).

[5] This structural argument also answers the majority's contention (Maj. Op. at 12) that Section 814(a)'s separate use of the terms "drug" and "listed chemical" demonstrates that drugs cannot be treated as listed chemicals. Section 814(a) requires the Attorney General to "remove from exemption under section 802(39)(A)(iv) . . . a drug or group of drugs that the Attorney General finds is being diverted to obtain a listed chemical." 21 U.S.C. § 814(a); *see also id.* § 802(39)(A)(iv)(I)(bb). The exemption referenced is the exemption from "regulated transaction" status for transactions "in a listed chemical that is contained in a [FDA-approved] drug." *Id.* § 802(39)(A)(iv). The fact that Congress, in Section 814(a), told the Attorney General to revoke this exemption in certain circumstances

lines, "[t]hus a 'regulated transaction' includes any ephedrine drug product as a 'listed chemical.'" 67 Fed. Reg. at 77,806.[6]

means that, in the absence of such an exemption, transactions in FDA-approved drugs containing listed chemicals can be treated as regulated transactions — that is, transactions in listed chemicals. *See id.* § 802(39)(A). The majority's invocation of Section 814(e), concerning the road to reinstatement of that exemption for ephedrine-containing drugs, only reinforces this point in a particularly germane way.

[6] The majority protests that the DCDCA is irrelevant because it did not alter the language of Section 971(c)(1). *See* Maj. Op. at 11–12 n.2. The *language* of Section 971(c)(1) was not changed, but the *meaning* of that language was. The DCDCA — and the CMCA after it — broadened the scope of the defined term "regulated transaction" in Section 802 — a term that appears in the text of Section 971(c)(1) — to include transactions in drugs containing ephedrine. Section 971 applies to that class of "regulated transactions" that are imports and exports, *i.e.*, imports and exports of listed chemicals; by specifying that "regulated transactions" include transactions in drug products containing ephedrine, the DCDCA and CMCA changed the reach of Section 971.

In faulting the Deputy Administrator's reasoning along these lines, the majority gives insufficient weight to the agency's views on how the statutes Congress entrusted to *the agency* to administer should be read together. *See, e.g.*, *Natural Resources Defense Council, Inc. v. EPA*, 859 F.2d 156, 202 (D.C. Cir. 1988) ("As the agency charged with interpreting the complicated statutory provisions that comprise the [Clean Water Act], EPA is entitled to considerable deference in the interpretive process of making the regulatory machinery work."). The majority's suggested reading would also lead to the incongruous result that DEA could reach transactions involving drugs containing ephedrine as "regulated transactions" under other provisions, but could not address those same transactions through its Section 971 power, despite the lack of any evidence that Congress wanted DEA to address such transactions armed with only part of its usual arsenal. More fundamentally, the majority's objections to the Deputy Administrator's analysis sound in *Chevron* step one, when the whole point is that he was *not*

This is not a "plain language" argument, and the Deputy Administrator did not say that it was.[7] The agency here did not just parse language; it applied its experience and expertise administering the statutes entrusted to it by Congress to resolve any question about the scope of Section 971 in light of the evolving reach of the definitional provisions in Section 802 — which apply throughout the drug control laws — concluding that this would most faithfully carry out the will of Congress. *See Chevron*, 467 U.S. at 844 (deference appropriate "whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations" (quotation omitted)). DEA's interpretation is a vivid example of bringing agency "experience and expertise" to bear on statutory construction of the sort that the majority describes as wholly absent. *See* Maj. Op. at 10, 16.

The majority relies almost exclusively for its contrary view on the paragraph in the Deputy Administrator's ruling discussing the Ninth Circuit's decision in *United States v. Daas*, 198 F.3d 1167, 1175 (1999). The Deputy Administrator began the paragraph — which appears *after* his discussion of the foregoing structural argument — by stating that *Daas* provided "additional support" for the government's position. 67 Fed. Reg. at 77,806. He then noted:

---

undertaking to show that his reading of the statute was unambiguously compelled. *See infra* at 13–16.

[7] In the Proposed Final Order submitted with its exceptions to the ALJ decision, the government sought to have the Deputy Administrator rely on "[t]he plain language of this statutory provision" and conclude that "the statute's plain meaning is clear." Government's Exceptions to Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision of the ALJ (Apr. 25, 2002), App. A, at 5, 6. Although he adopted much of the government's Proposed Final Order, the Deputy Administrator did not accept that language.

The Daas court stated: "The chemical matrix in which ephedrine and pseudoephedrine are contained is irrelevant because they do not disappear, become different chemicals, or become useless when combined with other substances to make [finished products]. For the purposes of § 841(d)(2), the other ingredients * * * function solely as a carrier medium or packaging material facilitating the distribution of the listed chemical." The court concluded that "the plain meaning of 'listed chemical' encompasses the ephedrine and pseudoephedrine contained in [finished products]." The Deputy Administrator finds this analysis equally applicable to the instant case.

*Id.* (citation omitted and alteration in original).

Two points about this paragraph: First, *Daas* was a criminal case; the Ninth Circuit was not there reviewing an agency's interpretation of "listed chemical." Its use of the phrase "plain meaning" obviously was not shorthand for a *Chevron* determination that "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.

Second, the "analysis" that the Deputy Administrator found applicable was the discussion of how the listed chemicals do not change composition when combined with other ingredients. This is clear from the immediately preceding paragraph of the Deputy Administrator's decision, which distinguishes three cases relied on by the ALJ because they — unlike *Daas* — did not analyze the "issue of chemical identity." 67 Fed. Reg. at 77,806. The Ninth Circuit's "plain meaning" conclusion was just that — a conclusion, not "analysis." The Deputy Administrator's partial reliance on *Daas* for part of the interpretive question at issue here thus affords no justification for the majority's failure to follow normal *Chevron* analysis.

In short, I am at a loss to understand how the majority can fairly describe the Deputy Administrator's decision as "rest[ing] simply on [his] parsing of the statutory language." Maj. Op. at 16.[8] In discussing his interpretation of the statute, the Deputy Administrator examined the interplay between Section 971 and the definition of "regulated transaction" set out in Section 802, and the legislative history of the statutes that amended that definition to include drugs containing ephedrine. *See* 67 Fed. Reg. at 77,806. He discussed, in addition to the Ninth Circuit decision in *Daas*, four other DEA decisions concerning suspensions of importations under Section 971. *See id.* He considered legislative history and weighed policy concerns about closing loopholes, on the one hand, and about imposing "strict liability," on the other. *See id.* In sum, the Deputy Administrator's decision looks to be a quite ordinary construction of a statute over which the agency has been given interpretive authority.

It emphatically is not like *Alarm Industry Communications Committee v. FCC*, 131 F.3d 1066 (D.C. Cir. 1997), where, in interpreting a statutory term, the agency relied *only* on *Black's Law Dictionary*, and expressly concluded that "the statutory language . . . is unambiguous and . . . the plain meaning of the term requires that an 'entity' have an independent legal existence." 131 F.3d at 1068 (quoting *In re Ameritech*, 12 F.C.C.R. 3855, 3859, ¶ 9 (1997)) (internal quotation marks omitted). Nor is this case like *Prill*, where we found "[t]he Board's opinion clearly reveals that it considered its adoption of a narrow test for 'concerted activities' . . . to be mandated by the NLRA itself" and that the agency was otherwise "without discretion to construe 'concerted activities.'" 755 F.2d at 948. *Transitional Hospitals Corpo-*

---

8 In a footnote to the just-quoted passage, the majority states that the Deputy Administrator "use[d] 'the traditional tools of statutory construction.'" *Id.* at 16 n.4 (quoting *Chevron*, 467 U.S. at 843 n.9).

*ration v. Shalala*, 222 F.3d 1019 (D.C. Cir. 2000), and *Arizona v. Thompson* are similarly inapposite. *See Transitional Hosps.*, 222 F.3d at 1029 ("the notice … makes it quite clear the Secretary did not believe she had the discretion to do what the plaintiffs request"); *id.* (" '*We do not believe that the statute permits us* to extend….' " (quoting Final Rule, 57 Fed. Reg. 39,800–01)); *Arizona*, 281 F.3d at 253 ("[T]he Action Transmittal declares that 'the TANF legislation … *does not permit* it being designated as the primary … program.' " (quoting HHS Action Transmittal 98–2)). There is nothing in the Deputy Administrator's decision here that even faintly approximates a confession of powerlessness similar to the ones in these cases.

3. Even if the statutory language were ambiguous, and even if the Deputy Administrator did read it as plain, a *Prill* remand would still not be required. I have no quarrel with the basic proposition — expressed in *Prill* and the other cases cited by the majority — that when an agency erroneously concludes that a statutory interpretation is required by Congress, we should remand to give the agency an opportunity to interpret the statute in the first instance. That course is consistent with principles of *Chevron* deference, and with the respect due Congress's delegation of interpretive authority to the agency. But this rule should not be extended beyond its rationale.

The rationale that animates all *Prill* remands is real and genuine doubt concerning what interpretation the agency would choose if given the opportunity to apply "any permissible construction." *See, e.g.*, *Prill*, 755 F.2d at 956–67 ("This is not a case in which the 'mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached.' … [W]e cannot say that the Board's error in this case clearly had no bearing on the result reached.") (quoting *Massachusetts Trustees v. United States*, 377 U.S. 235, 248 (1964)). Here, though, there is no such open question. We know how the agency would choose to interpret the statute because, unlike the situations in the

cases on which the majority relies, the agency reached its interpretation in the course of a purely discretionary act, and the substance of its preferred interpretation is implicit in the decision to exercise that discretion.

In the cases cited by the majority, we were reviewing proceedings initiated by members of the regulated community demanding that the agency take corrective action required by the invoked statute. Prill brought an unfair labor practice complaint alleging that his termination was based on actions protected as "concerted activity" under the National Labor Relations Act. *See Prill*, 755 F.2d at 942. *Alarm Industry* was initiated when an alarm monitoring trade association moved the FCC for an order to show cause why Ameritech's acquisition of a corporation's alarm monitoring assets did not violate the Telecommunications Act. *See* 131 F.3d at 1068. In *Transitional Hospitals*, a pair of long-term care hospitals contended that certain Medicare reimbursement regulations violated the governing statute. *See* 222 F.3d at 1022–23. And in *Arizona v. Thompson*, six states challenged regulations restricting the use of grants from the Department of Health and Human Services. *See* 281 F.3d at 250. In each case, the agency determined that the statute at issue unambiguously rendered it powerless to grant relief.

Not so here. The majority's premise is only that DEA believed that Congress compelled an interpretation of Section 971 that *permits* the agency to reach the diversion of ephedrine in finished drug products. Section 971(c)(1) is a *permissive* grant of authority. The majority does not suggest that DEA believed that Congress compelled an interpretation that *required* it to suspend PDK's imports. Here, DEA could have — in an exercise of prosecutorial discretion — granted PDK relief and vacated the orders to suspend shipment. But DEA — in an exercise of that same prosecutorial discretion — chose not to grant relief to PDK. That makes this case very different from *Prill* and its progeny.

DEA wanted to suspend PDK's imports. We know this because it did suspend the imports. If it did not want to, the agency had discretion to choose otherwise. Given its manifest desire to suspend PDK's imports, it is fanciful to suggest that the agency — when presented on remand with an opportunity to choose "any permissible construction" of Section 971 — will choose an interpretation that diminishes its discretion to an extent that places PDK's imports beyond its reach. Under these circumstances, I can find no reasonable and genuine doubt that the agency — if, as the majority says, it is truly free to choose among "any permissible construction," *i.e.*, any construction "not in conflict with the plain language of the statute," *K Mart Corp. v. Cartier Inc.*, 486 U.S. 281, 292 (1988) — will elect a narrower, self-abnegating interpretation.

In the absence of such doubt, a *Prill* remand outstrips its rationale. " '*Chenery* does not require that we convert judicial review of agency action into a ping-pong game.' " *Time, Inc. v. U.S. Postal Serv.*, 667 F.2d 329, 335 (2d Cir. 1981) (Friendly, J.) (quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766–67 n.6 (1969) (plurality opinion)); *see Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (Posner, J.) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); *Illinois v. ICC*, 722 F.2d 1341, 1348 (7th Cir. 1983) (Posner, J.) ("*Chenery* does not require futile gestures."). This is especially the case where, as here, we have the Deputy Administrator's informed explanation of the reasonable grounds for his interpretation.

\* \* \*

I end where I began — with regret that the majority feels compelled to address far-reaching questions on which we disagree, when they are wholly unnecessary to the disposition of the case. As Justice Frankfurter once put it: "These are perplexing questions. Their difficulty admonishes us to observe the wise limitations on our function and to confine

ourselves to deciding only what is necessary to the disposition of the immediate case." *Whitehouse v. Illinois Central R. Co.*, 349 U.S. 366, 372–73 (1955).