**ALARM INDUSTRY
COMMUNICATIONS COMMITTEE,
Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Ameritech Corporation, Intervenor.**

**No. 97–1218.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 14, 1997.

Decided Dec. 30, 1997.

Danny E. Adams, Washington, DC, argued the cause for petitioner. With him on the briefs was Steven A. Augustino.

Stewart A. Block, Counsel, Federal Communications Commission, Washington, DC, argued the cause for respondents. With him on the brief were William E. Kennard, General Counsel at the time the brief was filed, Daniel M. Armstrong, Associate General Counsel, and John E. Inglé, Deputy Associate General Counsel. Andrea Limmer and Robert B. Nicholson, Attorneys, U.S. Department of Justice, entered appearances.

Kenneth S. Geller, Washington, DC, argued the cause for intervenor Ameritech Corporation. With him on the brief was Evan M. Tager.

Before: EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Do a corporation's assets, when organized in a separate operating division and dedicated to a particular line of business, constitute an "entity"? This and related questions, in

less abstract form, are posed by a provision in the Telecommunications Act of 1996. Pub.L. No. 104–104, 110 Stat. 56 (to be codified in various sections of 47 U.S.C.). The provision, 47 U.S.C. § 275(a), forbids any Bell Operating Company or affiliate from providing "alarm monitoring services" for 5 years from February 8, 1996—unless the company was already in that market. Only Ameritech Corporation qualified for the exemption. Ameritech thus could continue providing alarm monitoring services, but during the 5 year period § 275(a)(2) prohibited it from acquiring "any equity interest in," or obtaining "financial control of, any unaffiliated alarm monitoring service entity." The Federal Communications Commission thought the word "entity" in this clause had a clear and precise meaning—it included only an object with a separate legal existence such as a corporation. Ameritech therefore could, the Commission ruled, purchase alarm monitoring assets organized and operated in an unincorporated division of Circuit City Stores, Inc.

I

There is no need to repeat the description, found in many of our opinions, of the 1982 AT&T modified final judgment; the consolidation of the Bell Operating Companies, or BOCs, into seven (now only five) regional holding companies, including Ameritech Corporation; or the "line of business" restrictions contained in the judgment. One such restriction prohibited the BOCs from entering the "information services market." *United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131, 189 (D.D.C.1982), *aff'd mem. sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). This market included alarm monitoring services. Providers of such services place devices on a customer's property to detect possible threats from burglary, fire, vandalism, and the like; when triggered, the devices transmit signals to a remote center, alerting monitors there of the need to inform the customer or police, fire, rescue, security, or public safety personnel. *See* 47 U.S.C. § 275(e).

By 1991, the district court had lifted the "information services" ban. *See United States v. Western Elec. Co.*, 993 F.2d 1572 (D.C.Cir.1993). But only Ameritech thereafter entered the alarm services market. It did so in late 1994 when it purchased the assets of a security alarm monitoring company based near Chicago. In early fall 1995, Ameritech expanded operations by acquiring the stock of The National Guardian Corporation, a company with accounts nationwide. Through SecurityLink, a wholly-owned subsidiary, Ameritech now serves some 367,000 customers and is the second-largest provider of alarm services in the country.

The Telecommunications Act of 1996 added a new Part III to Title II of the Communications Act of 1934. Entitled "Special Provisions Concerning Bell Operating Companies," this portion of the Act regulated the entry of BOCs into certain markets. *See* 47 U.S.C. §§ 271—76. We are concerned here with 47 U.S.C. § 275(a):

**(a) Delayed entry into alarm monitoring**

**(1) Prohibition**

No Bell operating company or affiliate thereof shall engage in the provision of alarm monitoring services before the date which is 5 years after February 8, 1996.

**(2) Existing Activities**

Paragraph (1) does not prohibit or limit the provision, directly or through an affiliate, of alarm monitoring services by a Bell operating company that was engaged in providing alarm monitoring services as of November 30, 1995, directly or through an affiliate. Such Bell operating company may not acquire any equity interest in, or obtain financial control of, any unaffiliated alarm monitoring service entity after November 30, 1995, and until 5 years after February 8, 1996, except that this sentence shall not prohibit an exchange of customers for the customers of an unaffiliated alarm monitoring service entity.

Several months after § 275 became law, Ameritech purchased all of the alarm monitoring assets of Circuit City Stores, Inc., and integrated them into SecurityLink. Circuit City had organized the assets—customer contracts, monitoring center hardware and

software, and alarm equipment inventory—in its Home Security Division, an unincorporated operating division. Ameritech extended offers of employment to all Circuit City employees whose work had been fully dedicated to the Home Security Division. After the asset purchase, the Home Security Division ceased to exist and Circuit City ceased providing alarm monitoring services.

In August 1996, petitioner Alarm Industry Communications Committee ("AICC"), representing the trade group Central Station Alarm Association, asked the Federal Communications Commission to issue an order to show cause why Ameritech's "acquisition of the alarm monitoring business of Circuit City ... is not in violation of" § 275(a)(2). It further requested that the Commission issue a cease and desist order directing Ameritech "to rescind its Circuit City purchase and to refrain from soliciting for or engaging in any additional acquisitions of alarm monitoring businesses" until the expiration of the five-year statutory moratorium. AICC argued that the purchase of Circuit City's alarm monitoring assets constituted obtaining "financial control" of an alarm monitoring entity because the existence of the alarm monitoring business depended on the control of such assets. It maintained that "Congress did not intend to give Ameritech free reign to use the five year moratorium period to acquire its competitors and dominate the alarm industry."

Ameritech responded that "the statute is silent about, and thus does not bar, asset acquisitions." According to Ameritech, the "failure to prohibit asset acquisitions expressly" suggested that "Congress believed that there is a valid distinction between acquiring assets and acquiring equity and/or financial control.... Congress could well have concluded that alarm businesses should be shielded from 'hostile' takeovers by Ameritech, but that there is no need to prevent them from engaging in voluntary transactions with Ameritech." ·

A split Commission denied AICC's motion, concluding that Ameritech's asset acquisition did not violate § 275(a)(2). *See In re Enforcement of Section 275(a)(2) of the Communications Act of 1934, as Amended by the Telecommunications Act of 1996, Against Ameritech Corporation,* 12 F.C.C.R. 3855 (1997) ("*In re Ameritech*"). The Commission held that "the statutory language regarding 'alarm monitoring service entity' is unambiguous and ... the plain meaning of the term requires that an 'entity' have an independent legal existence." *Id.* at 3859, ¶ 9. Since Home Security Division was not "legally separate" from Circuit City, it did not constitute an "alarm monitoring service entity." *Id.*

Commissioner Ness dissented. To her, § 275(a)(2) had neither a clear meaning nor the meaning the Commission ascribed to it. Rather, she found that the answer lay "in an effort to discern the logic of the underlying congressional policy." 12 F.C.C.R. at 3863. This policy, she believed, was to allow a grandfathered BOC to expand its alarm business only through competition. *Id.* at 3864.

II

The phrase in § 275(a)(2)—"alarm monitoring service entity"—had, the Commission thought, a plain meaning because *Black's Law Dictionary* contained this definition of "entity": "an organization or being that possesses separate existence for tax purposes." *See* BLACK'S LAW DICTIONARY 532 (6th ed.1990). Only the Circuit City corporation, as distinguished from its Home Security Division, fits this description. Hence, the "alarm monitoring service entity" consisted of the corporation, not its operating division. When Ameritech made its asset purchase, it did not "obtain financial control of" or "acquire any equity interest in" the corporation, and thus, in the Commission's view, Ameritech had not violated § 275(a)(2).

When the purported "plain meaning" of a statute's word or phrase happens to render the statute senseless, we are encountering ambiguity rather than clarity. So here. The Commission's interpretation means that although § 275(a)(2) precluded Ameritech from acquiring even one share of Circuit City's stock, Ameritech was free to acquire the company's entire alarm monitoring services division—lock, stock, and barrel. We asked Commission counsel at oral argument what

possible rationale Congress could have had in mind if this is what it intended. Counsel replied: "I'm not saying that the statute makes perfect sense." This answer assumes, of course, that the problem is with the statute rather than the Commission's interpretation of it.

Counsel did offer one explanation, not mentioned by the Commission: The first clause in this part of § 275(a)(2) speaks of acquiring an "equity interest" and this necessarily refers only to legal beings; therefore, the next clause dealing with obtaining "financial control" must do the same. Even if we were to credit the premise, the explanation contains problems of its own. Suppose Ameritech had made a cash purchase of all of the assets of Circuit City, not just those in the Home Security Division. How could one say that Ameritech had obtained "financial control" of the Circuit City corporation? The corporation would still exist; it would merely hold cash instead of the assets it sold; and Ameritech could not control how the corporation disposed of the cash. In other words, the form of the transaction would be determinative: § 275(a)(2) would allow an asset purchase of an alarm monitoring "entity," but not a stock purchase. Why would Congress have set up that distinction? On the other hand, if Ameritech's purchase of all Circuit City's assets constituted obtaining financial control of an "alarm monitoring service entity," why would not the same be true regarding Ameritech's purchase of just the assets devoted to the alarm monitoring business? Counsel for the Commission could not respond to our inquiries on this subject because the issue is currently pending before the Commission in cases in which Ameritech purchased all of the assets of other alarm monitoring service corporations.

The Commission's belief that it had no other option than to read "alarm monitoring service entity" as it did was, we think, mistaken. We reach this conclusion without conferring the deference commonly extended to an agency's interpretation of a statute it administers. *See Cajun Elec. Power Coop. v. FERC,* 924 F.2d 1132, 1136 (D.C.Cir.1991). The Commission's reading of § 275(a)(2) reflects no consideration of other possible interpretations, no assessment of statutory objectives, no weighing of congressional policy, no application of expertise in telecommunications. The Commission gave its meaning to the provision on the basis of a dictionary and, as we shall discuss in a moment, in light of an inapplicable definitional provision in another part of the Act.

The Commission's use of *Black's Law Dictionary* raises an obvious question. If it is proper to use any dictionary to define "entity" in § 275(a)(2), why choose *Black's*? One answer—an answer that casts doubt on the Commission's "plain meaning"—is that other dictionaries lead to different or uncertain outcomes. Consider, for instance, *The American Heritage Dictionary of the English Language.* It defines "entity" as "something that exists as a particular and discrete unit." AMERICAN HERITAGE DICTIONARY 614 (3d ed.1992). That might fit the Home Security Division. But what is a "unit"? A "unit" is an "individual, a group, a structure or other entity regarded as an elementary structural or functional constituent of a whole." *Id.* at 1953. As is common, there is some circularity here; the definition of "unit," which is used to define "entity," uses "entity." Still, it is hardly evident why Circuit City's operating division was something other than a "group" or "structure" that was a "functional constituent of a whole," the whole being the Circuit City corporation—in other words, the division was a particular and discrete unit, an "entity." Treating the term in this expansive manner is at least consistent with the idea that "entity" is "the broadest of all definitions which relate to bodies or units." 2 COLLIER ON BANKRUPTCY ¶ 101.15 (15th ed.1997). To cite another dictionary, *The New Shorter Oxford English Dictionary* illustrates the meaning of "entity," and its proper use, with a literary quotation: "How could the people . . . act as a collective entity . . . unless they were . . . organized"? 1 NEW SHORTER OXFORD ENGLISH DICTIONARY 830 (thumb index ed.1993). Given the illustration, one could rightly ask: "How could the Home Security Division act as a collective entity unless it was organized?"

There is no need to go through similar analyses with other dictionaries. We have

written enough to show that § 275(a)(2) presents a puzzle, and that the wooden use of a dictionary cannot solve it. Nor can the definition of "entity" contained in § 274(i)(6) of the Act, which is the only other reason the Commission offered for its result.

Section 274(i)(6) defines "entity" for the purpose of BOCs' entry into electronic publishing. It states that "entity" means "any organization, and includes corporations, partnerships, sole proprietorships, associations, and joint ventures." 47 U.S.C. § 274(i)(6). Even if § 274(i)(6) controlled the interpretation of § 275(a)(2)—the Commission admits it does not—the provision's list of examples is not exhaustive. "[T]he word 'includes' is a term of enlargement, not of limitation." *American Fed'n of Television & Radio Artists v. NLRB*, 462 F.2d 887, 890 (D.C.Cir. 1972). Commission counsel notices that § 274(i)(6) lists "complete business units, not subparts," Brief for Respondent at 19, but this still leaves open the possibility that an unincorporated division is an "organization." In *American Federation*, for instance, we held that a statute defining the term "person" to include "individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers," did not exclude separate operating divisions of the same corporation. 462 F.2d at 889–90. An operating division may be, as the Commission tells us, "merely an internal administrative fiction." But we do not understand why that is necessarily decisive. For one thing, the legal personhood of a corporation is itself a fiction. *See* 1 FLETCHER CYCLOPEDIA CORPORATIONS § 25 (perm. ed.1990). For another thing, nothing appeared artificial or fictitious in Circuit City's organizing assets in a separate operating division to provide alarm monitoring services. As Commissioner Ness pointed out in her dissenting opinion, "Ameritech acquired the central station hardware and software, took over all residential and business customer contracts, and employed the same workforce previously employed by Circuit City. Ameritech has not identified anything that was previously a part of Circuit City's Home Security Division that did not become part of Ameritech." 12 F.C.C.R. at 3862 n. 31.

The Commission's treatment of the "alarm monitoring service entity" also runs into another difficulty. It tends to make § 275(a)(2)'s final clause superfluous. This clause allows Ameritech to exchange its customers "for the customers of an unaffiliated alarm monitoring service entity." Ameritech tells us that the customer exchange clause is not really an exception to § 275(a)(2)'s bar against its acquiring an equity interest or financial control. This may well be true. It would be unusual if, by exchanging customers with a company, Ameritech wound up with an equity interest in or financial control of the company. But whether the clause is, or is not, an exception is of little moment. The important fact is that it mentions customer accounts specifically. Customer accounts are a type of asset. If, as the Commission supposed, the clauses preceding the customer exchange clause place no restraints on asset acquisitions of less than everything the corporation holds, why the explicit language in § 275(a)(2) allowing the acquisition of one kind of asset—customer accounts? Commissioner Ness asked this question but neither she, nor this court, has been provided with any good answer. *See* 12 F.C.C.R. at 3864. When the supposed plain meaning of one clause in a section renders another clause nugatory, it is time to put aside the dictionaries and start considering what interpretation best comports with congressional intent. *See, e.g., Davis County Solid Waste Management v. EPA*, 101 F.3d 1395, 1404 (D.C.Cir.1996); *Mail Order Ass'n of America v. United States Postal Serv.*, 986 F.2d 509, 515 (D.C.Cir.1993).

This brings us back to the question we asked earlier. Why would Congress prohibit Ameritech from purchasing even one share of an alarm monitoring company's stock, but allow it to purchase all of the company's assets devoted to that line of business? The Commission did not address the subject. Ameritech, believing that the meaning of § 275(a)(2) is also plain but somewhat different than the Commission's reading, deals with the question this way. According to Ameritech, § 275(a)(2) permits it to purchase all or part of the assets in an alarm monitoring service entity but not the stock of the

company because Congress wanted to prevent hostile takeovers, yet allow "voluntary transactions." This strikes us as far-fetched, for several reasons. One cannot take over a publicly-traded company with one share, yet all parties agree that Ameritech would violate the statute by acquiring just one share. Also, management of the target company might welcome Ameritech's buying enough stock to gain a controlling interest, but the statute nevertheless prohibits this. In short, Ameritech's theory does not fit what Congress actually did, which was to impose a far more extensive bar than, in Ameritech's words, merely forbidding its "taking over a rival business against the wishes of that business' management."

The notion that Congress drew a distinction between asset and equity acquisitions to protect the management of alarm monitoring companies is unsupported by any evidence we have seen. Many such companies, according to one source, are small, family-owned businesses with an average of eight employees. *See Communications Law Reform: Hearings Before the Subcomm. on Telecommunications and Finance of the House Comm. on Commerce,* 104th Cong. 452 (1995) (Statement of James Synk, Executive Director, National Burglar and Fire Alarm Association). The companies whose assets Ameritech purchased after the Circuit City transaction—Norman Security Systems, Inc., and Central Control Alarm Corporation—had one and two shareholders respectively. In both companies, the shareholders were also corporate officers. Any acquisition of such closely-held businesses could be accomplished by an asset purchase or a stock purchase; in either case, the transaction would be "voluntary." Ameritech believes Congress permitted the first method, but not the second. While tax ramifications might influence how the parties structure such a deal, *see* 1 MARTIN D. GINSBURG & JACK S. LEVIN, MERGERS, ACQUISITIONS, AND BUYOUTS § 105 (1997), we cannot imagine anything having to do with telecommunications policy that would turn on the method of acquisition.

Furthermore, it is hard to see why it would have mattered to Congress whether a potential target of Ameritech ran its alarm monitoring business through a wholly-owned incorporated subsidiary or, as here, through an unincorporated operating division. In the law of antitrust, liability does not "depend on whether a corporate subunit is organized as an unincorporated division or a wholly owned subsidiary." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 772, 104 S.Ct. 2731, 2742, 81 L.Ed.2d 628 (1984). "The economic, legal, or other considerations that lead corporate management to choose one structure over the other are not relevant to whether the enterprise's conduct seriously threatens competition." *Id.* at 772, 104 S.Ct. at 2742. Yet Ameritech's approach, and perhaps the Commission's, assume that those considerations are somehow relevant to telecommunications law. If the Home Security Division had been separately incorporated, Ameritech and the Commission agree that § 275(a)(2) would have barred a stock purchase. But Ameritech believes the statute would have permitted it to buy the subsidiary's assets in the same manner it did here. The Commission considers the question open. For the future it may not matter. If the Commission decided that Ameritech could not purchase the assets of an incorporated subsidiary, the seller could merely reconfigure its structure before the sale so that its alarm monitoring assets were held in an unincorporated division.

Commissioner Ness could find no logic in any of this. The distinctions between stock purchases and asset purchases are not tied to anything remotely related to the evident objective of § 275(a)(2). In her view, Congress wanted to authorize Ameritech to continue in the alarm business but to allow it to expand its business "only through competition, not acquisitions" until the excluded BOCs were permitted to enter the market. 12 F.C.C.R. at 3864. The tortured history of the Telecommunications Act does not shed much light on the matter. Although Congress rejected an earlier version that precluded a grandfathered Bell from acquiring "the alarm monitoring service activities of another entity," S. 652, 104th Cong. (1995), it never explained the change and the earlier draft made no mention of "financial control." On February 1, 1996, the day both Houses approved the Telecommunications Act, Repre-

sentative Hyde stated, in written remarks inserted into the Congressional Record, that grandfathered BOCs "may grow their alarm monitoring business through customer or asset acquisitions." 142 CONG. REC. H1158 (daily ed. Feb. 1, 1996) (statement of Rep. Hyde). On the same date, Senator Pressler commented, "The language in the bill . . . is intended to include a prohibition on the acquisition of the underlying customer accounts and assets." 142 CONG. REC. S689 (daily ed. Feb. 1, 1996) (statement of Sen. Pressler).

It is not for the court, at this stage, to choose between competing meanings. Rather than having a plain meaning as the Commission thought, we find the disputed language in § 275(a)(2) uncertain. For that reason we must vacate the Commission's order and send the case back. It will be up to the Commission to decide how best to resolve the ambiguity in the phrase "alarm monitoring service entity." We do not intend to foreclose the Commission from interpreting the phrase narrowly. But whatever interpretation it adopts must be supported by more than a dictionary.

The petition for review is granted. The Commission's Order is vacated and the case is remanded to the Commission.

*So ordered.*