ROBERTS, Circuit Judge,
concurring in part and concurring in the judgment:
I agree with the majority that PDK has standing to seek review of DEA’s suspension order, and that the order must be vacated because it relies, in significant part, upon a conclusion that PDK violated certain export notification regulations — a conclusion that contradicted relevant agency precedent without explanation. This much is not terribly controversial; DEA conceded its error and all but conceded that this court should remand the decision on that basis. See DEA Br. 59 (“we acknowledge that, in such circumstances, the ordinary practice would be a remand to the agency”). This is a sufficient ground for deciding this case, and the cardinal principle of judicial restraint — if it is not necessary to decide more, it is necessary not to decide more — counsels us to go no further.
My brethren, however, are not content with this narrow and effectively conceded basis for disposition, and instead adopt an alternative ground of far broader significance, one that precipitates disagreement among us but at the end of the day leads to the same result — vacatur and remand to the agency. I cannot go along for that gratuitous ride.
* * *
The majority’s alternative basis for remand sidesteps the familiar Chevron analysis, see Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984), substituting in its stead an argument in three parts: (1) the Deputy Administrator thought the plain meaning of Section 971 gave him discretion to suspend importation in this case, (2) Section 971 has no plain meaning but is in fact susceptible of different interpretations on the question presented, and (3) the case must therefore be sent back so that the Deputy Administrator can decide which construction he thinks is right (as opposed to compelled) and explain why.
This reasoning fails at each step, and each defect is fatal to the majority’s analysis. First, Section 971(c)(1) is not ambiguous, and the Deputy Administrator’s inter *800 pretation in this case is entirely consistent with the clearly expressed intent of Congress. Second, the Deputy Administrator's decision cannot fairly be read as reflecting the view that he felt compelled to read the statute as he did, as opposed to simply adopting the construction that seemed most reasonable to him, and explaining his reasons for that. Finally, even if Section 971 were ambiguous, and even if the Deputy Administrator erroneously rested his decision only on a plain reading of the statute, a remand still would not be necessary. We know how the agency would construe the statute, because its interpretation in this case was reached in the course of a purely discretionary act. If the agency did not want to block this importation, nothing in Section 971(c) required it to do so. This is hardly a case — like those cited by the majority — in which the agency felt it was forced to take the action it did, based on an erroneous reading of the law.
1. I would uphold the agency’s interpretation of Section 971 under step one of Chevron. Congress has “directly addressed the precise question at issue,” and the Deputy Administrator’s position is entirely consistent with the “unambiguously expressed intent of Congress” on this subject. Chevron, 467 U.S. at 843, 104 S.Ct. at 2781.
“We turn first, as we must, to the language of the statute, the most important manifestation of Congressional intent.” Public Citizen, Inc. v. U.S. Dep’t of Health & Human Servs., 332 F.3d 654, 662 (D.C.Cir.2003) (quotation omitted). The language in question: “The Attorney General may order the suspension of any importation or exportation of a listed chemical ... on the ground that the chemical may be diverted to the clandestine manufacture of a controlled substance.” 21 U.S.C. § 971(c)(1). Ephedrine is a “listed chemical” under the statute. See 21 U.S.C. § 802(34)(C); id. § 951(b) (applying definitions from Section 802 to Controlled Substances Import and Export Act, 21 U.S.C. §§ 951-971). Thus, under Section 971(c)(1), the Attorney General may order the suspension of any importation of ephedrine on the ground that the ephedrine, if imported, may be diverted to the clandestine manufacture of a controlled substance. See 21 C.F.R. § 1313.41 (providing that DEA may suspend a shipment of a listed chemical “based on evidence” that the chemical may be diverted).
The statute contains no words of limitation. Any probability of diversion of any amount of ephedrine is a sufficient statutory basis for the invocation of the Attorney General’s authority. This is, to be sure, an expansive delegation of power. When faced with similarly broad grants of authority to the Executive, we have noted that “the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application.” Consumer Elecs. Ass’n v. FCC, 347 F.3d 291, 298 (D.C.Cir.2003). So here.
a. “Listed chemical.” The majority primarily takes issue with the Deputy Administrator’s conclusion that the term “listed chemical” can include PDK’s over-the-counter drug products containing ephedrine. See Maj. Op. at 794-96; 67 Fed. Reg. at 77,806. The majority explains that a drug containing a listed chemical is not the same as a listed chemical, and that the statute recognizes this distinction. Fair enough. What the majority fails to acknowledge, however, is that it is not PDK’s “MaxBrand Mini Two-Way Action” product (obviously itself not a “listed chemical,” but a “chemical mixture,” see 21 U.S.C. § 802(40)) that is regularly diverted to the manufacture of methamphetamine, but *801 rather the 25 mg of ephedrine that each Mini Two-Way Action pill contains.
Once it receives its bulk ephedrine, PDK combines the ephedrine with the decongestant guaifenesin and binders to form its Mini Two-Way Action pills. See PDK Br. 4. Throughout this process, the chemical composition of the ephedrine is unaltered. Illicit methamphetamine manufacturers then purchase or steal Mini Two-Way Action, and break the finished product back down into its component parts, yielding exactly the same pure ephedrine that was imported by PDK. See ALJ Op. ¶¶ 90-91. It is that imported ephedrine that is “diverted” — i.e., turned away from its intended destination or use, see infra at 4-5 — to the manufacture of methamphetamine. In this manner, it is the listed chemical itself — ephedrine — that is diverted to methamphetamine manufacturing. At the time of its “diversion,” the ephedrine extracted from PDK Mini Two-Way Action is just as much a listed chemical as when it was transported across the high seas in bulk form. . Thus, at least insofar as a listed chemical is readily extractable from its finished drug product, the text of Section 971(c) treats transactions (including a “diversion”) in that drug as transactions in the listed chemical it contains.
This interpretation comports with common sense. If a methamphetamine manufacturer steals, for the purpose of making methamphetamine, a bottle containing pure ephedrine, or pure ephedrine dissolved in water, or a bottle containing 50 ephedrine pills and 50 guaifenesin pills, we would not hear an argument that he did not divert a listed chemical because he also diverted a bottle, some water, or some guaifenesin. The presence of packaging materials or other extraneous items does not vitiate the existence of the listed chemical. Here, a bottle of PDK Mini Two-Way Action contains pills each consisting of 25 mg of ephedrine and 200 mg of guaifenesin and binders. For purposes of Section 971(c), the decongestant and the binders are extraneous materials, no more relevant to the analysis than the bottles and boxes in which the pills are packaged.
b. “May be diverted.” The majority also finds ambiguity in the term “may be diverted.” I do not.
Although PDK did not object here or below to DEA’s construction of the term “diverted,” the majority suggests that, given the focus of Section 971 on imports and exports, the term may only cover hijackings during the import or export. See Maj. Op. at 796. Such a crabbed construction is untenable. First, it conflicts with the plain meaning and common usage of the verb. The Oxford English Dictionary defines “divert” to mean “[t]o turn aside (a thing, as a stream, etc.) from its (proper) direction or course; ... to turn from one destination or object to another.” IV OxFORD English DictionaRY 888 (2d ed.1989); see also Blaok’s Law Dictionary 491 (7th ed.1999) (defining “diversion” as “[a] deviation or alteration from the natural course of things”). That the term is broad does not make it ambiguous. See Diamond v. Chakrabarty, 447 U.S. 303, 315, 100 S.Ct. 2204, 2211, 65 L.Ed.2d 144 (1980) (“Broad general language is not necessarily ambiguous when congressional objectives require broad terms.”). The majority asks “[diverted from what?,” Maj. Op. at 796, but Congress did not choose to limit the statute along anysuch lines.[1]
*802 Moreover, the word “diversion” appears throughout both the statute that initially-enacted Section 971, the Chemical Diversion and Trafficking Act of 1988 (CDTA), Pub. L. No. 100-690, §§ 6051 et seq., 102 Stat. 4181, 4312, and the statute that expanded the CDTA’s reach to cover many finished drug products containing ephedrine, the Domestic Chemical Diversion Control Act of 1993 (DCDCA), Pub. L. No. 103-200, 107 Stat. 2333. There is, of course, a strong presumption that “identical words used in different parts of the same act are intended to have the same meaning.” Sullivan v. Stroop, 496 U.S. 478, 484, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990) (quotation omitted), and in no section of either the CDTA or the DCDCA is the term “diversion” used in the limited sense the majority speculates it might have been used in Section 971.[2]
The majority also contends that the “totality of the circumstances” standard applied by DEA in explaining its decision to suspend importation in this case, see 67 Fed. Reg. at 77,807; In re Mediplas Innovations, 67 Fed. Reg. 41,256, 41,262 (2002), “seems hardly the stuff of plain meaning.” Maj. Op. at 797. Noting that all ephedrine-containing drugs are diverted to some extent, the majority complains that DEA’s “kitchen-sink approach” could potentially permit DEA to ban ephedrine-eontaining drugs altogether. Id. at 797-98. This criticism confuses the grant of discretion with review for abuse. There is nothing unusual about a statute granting an agency broad discretion — plainly or otherwise — and the agency developing standards that govern the exercise of that discretion on a case-by-case basis, through adjudication rather than rulemaking. See, e.g., INS v. Aguirre-Aguirre, 526 U.S. 415, 429, 119 S.Ct. 1439, 1447-48, 143 L.Ed.2d 590 (1999); Chippewa & Flambeau Improvement Co. v. FERC, 325 F.3d 353, 359 (D.C.Cir.2003). Over time, that will result in an effective and salutary narrowing of the discretion enjoyed by the agency. See Henry J. FRIendly, More Definite Standards of Administrative Action: The Need, in BENCHMARKS 86, 97 (1967) (“[Wjhere the initial standard is thus general, it is imperative that steps be taken over the years to define and clarify it — to canalize the broad stream into a number of narrower ones.”). That process hardly belies the original broad grant of discretion.
c. Legislative history. Although we have been instructed not to “resort to legislative history to cloud a statutory text that is clear,” Ratzlaf v. United States, 510 U.S. 135, 147-48, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994); accord Air Transport Ass’n of Canada v. FAA, 323 F.3d 1093, 1096 (D.C.Cir.2003) (“ordinarily, we do not read legislative history to create otherwise non-existent ambiguities”), the majority relies upon legislative history to such an extent that a response seems in order. The majority’s main point is that Congress was not concerned about diversion of finished ephedrine-eontaining products in 1988, when Section 971 was enacted. See Maj. Op. at 794-95. Even if true, the Supreme Court has held often enough that “the fact that a statute can be applied in situations not expressly anticipated by *803 Congress does not demonstrate ambiguity. It demonstrates breadth.” PGA Tour, Inc. v. Martin, 532 U.S. 661, 689, 121 S.Ct. 1879, 1897, 149 L.Ed.2d 904 (2001) (internal quotation marks and citation omitted); accord Consumer Elecs. Ass’n, 347 F.3d at 298.
Moreover, as the Deputy Administrator recognized — and as will be demonstrated below — the history that is significant is the history of the DCDCA and its sibling Comprehensive Methamphetamine Control Act of 1996 (CMCA), Pub. L. No. 104-237, 110 Stat. 3099, for those are the statutes that broadened the ambit of the regulation of listed chemicals — including under Section 971 — to cover drugs containing ephedrine. As noted by the Deputy Administrator, that legislative history clearly demonstrates that Congress was very much concerned about the diversion of finished drug products containing ephedrine. See H.R.Rep. No. 103-379, at 6 (1993) (“This provision removes the exemption ... for drugs containing ephedrine ... because these products are being diverted in significant quantities for the illicit manufacture of methamphetamine”).
The majority also complains that the “loophole” cited by the Deputy Administrator in his decision bears no relationship to Section 971, because it dealt only with “reporting and record keeping relating to finished products.” Maj. Op. at 795. The majority is half right; the “loophole” in question did concern reporting and record keeping requirements. Of course, Section 971 is, first and foremost, a reporting requirement, and it is primarily the reporting that alerts the Attorney General to an importation that might be suspended. See 21 U.S.C. § 971(a). More importantly, the Deputy Administrator cited two references in the committee report in discussing the “loophole,” see 67 Fed. Reg. at 77,806, and the second — the one ignored by the majority — offered a more detailed description of the problem in question. The second reference was to the DEA Acting Administrator’s explanation that “the so-called ‘legal drug exemption’ which currently exempts drug products approved for marketing under the Food, Drug and Cosmetic Act from the regulatory provisions of our chemical control law” had become a “loophole,” “exploited by clandestine laboratory operators.” H.R.Rep. No. 103-379, at 8. It is that loophole that the DCDCA and CMCA revoked for drugs containing ephedrine, see 21 U.S.C. § 802(39)(A)(iv)(I)(aa), but which the majority’s proffered reading would restore for purposes of Section 971.
* * *
For all these reasons I would uphold the agency’s interpretation of Section 971 under step one of Chevron. The brqad language unambiguously confers discretion to suspend the importation at issue because the ephedrine in PDF’s products may be diverted to methamphetamine production, and nothing in the legislative history remotely suggests — let alone compels — a narrower reading.
2. The majority, however, concludes that the statute is ambiguous. But my colleagues refuse to proceed — as we ordinarily would in such circumstances — to Chevron’s second step, and ask whether the agency’s interpretation “is based on a permissible construction of the statute.” Chevron, 467 U.S. at 843, 104 S.Ct. at 2782.[3] Rather, they contend that a re *804 mand is required, citing Prill v. NLRB, 755 F.2d 941 (D.C.Cir.1985), and its progeny.
The Prill line of cases stands for the proposition that when an agency reads a statute in a particular way based on the erroneous belief that the reading was mandated by the statute (and thus the agency had no latitude to adopt a different interpretation), the case will be remanded so that the agency — now freed from its confined view of its own discretion — can reconsider its interpretation of the statute. See Prill, 755 F.2d at 947-48, 950-53. Here, the majority claims that “[t]he Deputy Administrator ... thought that § 971(c)(l)’s meaning was plain,” Maj. Op. at 795; see also id. at 794 (“The Deputy Administrator concluded that the statute plainly meant what the suspension orders assumed.”); id. at 798 (“we do not agree that the meaning of § 971(c)(1) is as plain as DEA says it is”); and that “[h]e reached this conclusion without mentioning any policy considerations or other matters within the agency’s expertise,” id. at 794-95; see also id. at 798 (“[I]t is incumbent upon the agency not to rest simply on its parsing of the statutory language. It must bring its experience and expertise to bear in light of competing interests at stake. ... [I]t has not done so here.”).
That is not how I read the Deputy Administrator’s decision. There is nothing here to suggest that the Deputy Administrator thought he was under Chevron step one as opposed to step two, or that he thought of Chevron at all. Compare, e.g., Arizona v. Thompson, 281 F.3d 248, 254 (D.C.Cir.2002) (“In Chevron terms, then, the agency has stopped at step one: HHS believes that the statute clearly bars primary program allocation, and that it is without discretion to reach another result.”). Contrary to the majority’s opinion, the Deputy Administrator did not state that the meaning of the statute is “plain.” He also never used words like “unambiguous” or other phrases evocative of Chevron step one, such as “directly spoken to the precise question at issue.” Instead, he said the critical language “must be construed” in light of other statutory language he considered relevant, distinguished three cases relied on by the ALJ, found “additional support” in a court of appeals case interpreting a related criminal statute, discussed a House Report, and rejected the ALJ’s policy concern that the government’s view would create “strict liability.” 67 Fed. Reg. at 77,806-07. Hardly the stuff of a plain language reading.
The Deputy Administrator’s interpretation of Section 971 rested primarily on the theory that the scope of Section 971 must be understood in light of the term “regu *805 lated transaction,” as defined in Section 802(39). See id. at 77,806; see also 21 U.S.C. § 951(b). This was the lead-off argument he made in defending his statutory reading.
It is a structural argument that leans heavily on the history of the listed chemical statutes. The CDTA, of which Section 971 was a part, see CDTA § 6053, 102 Stat. at 4314, generally widened the reach of the Nation’s drug laws to include precursor chemicals — ie., chemicals used to manufacture controlled substances. In the section immediately following that which enacted Section 971, the CDTA also amended Section 802 of the Controlled Substances Act to provide definitions for the terms “listed chemical,” “regulated person,” and “regulated transaction.” See CDTA § 6054(3), 102 Stat. at 4316 (codified at 21 U.S.C. § 802(34), (38), (39)). These terms have application not only in Section 971, but throughout the CDTA and its amendments — that is, in all the laws concerning the regulation of listed precursor chemicals.
At the time of the enactment of Section 971 in 1988, “regulated transaction” included imports and exports of listed chemicals — including ephedrine — but exempted “any transaction in a listed chemical that is contained in a drug that may be marketed or distributed lawfully in the United States under the Federal Food, Drug, and Cosmetic Act.” 21 U.S.C. § 802(39)(A)(iv) (1989). Similarly, Section 802(39)(A)(v) exempted transactions “in a chemical mixture,” defined as “a combination of two or more chemical substances, at least one of which is not a [listed chemical].” Id. § 802(39)(A)(v), (40). Thus, Section 802 specifically excluded all FDA-approved drug products and all chemical mixtures from the definition of “regulated transaction,” and, concomitantly, from coverage under' the CDTA, including Section 971.
Illegal methamphetamine manufacturers soon exploited this loophole. In 1993 and 1996, Congress responded by adding exceptions to its exception for FDA-approved drugs, effectively eliminating the exception for transactions in any “drug [that] contains ephedrine.” See DCDCA § 2(a)(6)(C), 107 Stat. at 2333-34 (removing exception for a drug containing ephedrine and “therapeutically insignificant quantities of another active medicinal ingredient”); CMCA § 401(a)(1), 110 Stat. at 3106-07 (codified as amended at 21 U.S.C. § 802(39)(A)(iv)(I)(aa)) (removing exception for any drug containing ephedrine, regardless of whether it contained other therapeutic ingredients).[4] The DCDCA and the CMCA thus eliminated any exception for ephedrine-containing drugs from the definition of “regulated transaction.” Because only listed chemical transactions qualify as “regulated transactions,” see 21 U.S.C. § 802(39)(A), the re-inclusion of transactions in ephedrine-containing drugs reflects congressional intent that transactions in those drugs be treated as transactions in listed chemicals.[5] As the Deputy *806 Administrator explained in expressly adopting the government’s reasoning along these lines, “[t]hus a ‘regulated transaction’ includes any ephedrine drug product as a ‘listed chemical.’ ” 67 Fed. Reg. at 77,806.[6]
This is not a “plain language” argument, and the Deputy Administrator did not say that it was.[7] The agency here did not just parse language; it applied its experience and expertise administering the statutes entrusted to it by Congress to resolve any question about the scope of Section 971 in light of the evolving reach of the definitional provisions in Section 802 — which apply throughout the drug control laws — concluding that this would most faithfully carry out the will of Congress. See Chevron, 467 U.S. at 844, 104 S.Ct. at 2782 (deference appropriate “whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations” (quotation omitted)). *807 DEA’s interpretation is a vivid example of bringing agency “experience and expertise” to bear on statutory construction of the sort that the majority describes as wholly absent. See Maj. Op. at 794, 798.
The majority relies almost exclusively for its contrary view on the paragraph in the Deputy Administrator’s ruling discussing the Ninth Circuit’s decision in United States v. Daas, 198 F.3d 1167, 1175 (1999). The Deputy Administrator began the paragraph — which appears after his discussion of the foregoing structural argument — by stating that Daas provided “additional support” for the government’s position. 67 Fed. Reg. at 77,806. He then noted:
The Daas court stated: “The chemical matrix in which ephedrine and pseu-doephedrine are contained is irrelevant because they do not disappear, become different chemicals, or become useless when combined with other substances to make [finished products]. For the purposes of § 841(d)(2), the other ingredients * * * function solely as a carrier medium or packaging material facilitating the distribution of the listed chemical.” The court concluded that “the plain meaning of ‘listed chemical’ encompasses the ephedrine and pseudoephed-rine contained in [finished products].” The Deputy Administrator finds this analysis equally applicable to the instant case.
Id. (citation omitted and alteration in original).
Two points about this paragraph: First, Daas was a criminal case; the Ninth Circuit was not there reviewing an agency’s interpretation of “listed chemical.” Its use of the phrase “plain meaning” obviously was not shorthand for a Chevron determination that “Congress has directly spoken to the precise question at issue.” Chevron, 467 U.S. at 842, 104 S.Ct. at 2781.
Second, the “analysis” that the Deputy Administrator found applicable was the discussion of how the listed chemicals do not change composition when combined with other ingredients. This is clear from the immediately preceding paragraph of the Deputy Administrator’s decision, which distinguishes three cases relied on by the ALJ because they — unlike Daas — did not analyze the “issue of chemical identity.” 67 Fed. Reg. at 77,806. The Ninth Circuit’s “plain meaning” conclusion was just that — a conclusion, not “analysis.” The Deputy Administrator’s partial reliance on Daas for part of the interpretive question at issue here thus affords no justification for the majority’s failure to follow normal Chevron analysis.
In short, I am at a loss to understand how the majority can fairly describe the Deputy Administrator’s decision as “restfing] simply on [his] parsing of the statutory language.” Maj. Op. at 797.[8] In discussing his interpretation of the statute, the Deputy Administrator examined the interplay between Section 971 and the definition of “regulated transaction” set out in Section 802, and the legislative history of the statutes that amended that definition to include drugs containing ephedrine. See 67 Fed. Reg. at 77,806. He discussed, in addition to the Ninth Circuit decision in Daas, four other DEA decisions concerning suspensions of importations under Section 971. See id. He considered legislative history and weighed policy concerns about closing loopholes, on the one hand, and about imposing “strict liability,” on the other. See id. In sum, the Deputy Ad *808 ministrator’s decision looks to be a quite ordinary construction of a statute over which the agency has been given interpretive authority.
It emphatically is not like Alarm Industry Communications Committee v. FCC, 131 F.3d 1066 (D.C.Cir.1997), where, in interpreting a statutory term, the agency relied only on Black’s Law Dictionary, and expressly concluded that “the statutory language ... is unambiguous and ... the plain meaning of the term requires that an ‘entity’ have an independent legal existence.” 131 F.3d at 1068 (quoting In re Ameritech, 12 F.C.C.R. 3855, 3859, ¶ 9, 1997 WL 136312 (1997)) (internal quotation marks omitted). Nor is this case like Prill, where we found “[t]he Board’s opinion clearly reveals that it considered its adoption of a narrow test for ‘concerted activities’ ... to be mandated by the NLRA itself’ and that the agency was otherwise “without discretion to construe ‘concerted activities.’ ” 755 F.2d at 948. Transitional Hospitals Corporation v. Shalala, 222 F.3d 1019 (D.C.Cir.2000), and Arizona v. Thompson are similarly inappo-site. See Transitional Hosps., 222 F.3d at 1029 (“the notice ... makes it quite clear the Secretary did not believe she had the discretion to do what the plaintiffs request”); id. (“ ‘We do not believe that the statute permits us to extend....’” (quoting Final Rule, 57 Fed. Reg. 39,800-01)); Arizona, 281 F.3d at 253 (“[T]he Action Transmittal declares that ‘the TANF legislation ... does not permit it being designated as the primary ... program.’ ” (quoting HHS Action Transmittal 98-2)). There is nothing in the Deputy Administrator’s decision here that even faintly approximates a confession of powerlessness similar to the ones in these eases.
3. Even if the statutory language were ambiguous, and even if the Deputy Administrator did read it as plain, a Prill remand would still not be required. I have no quarrel with the basic proposition — expressed in Prill and the other cases cited by the majority — that when an agency erroneously concludes that a statutory interpretation is required by Congress, we should remand to give the agency an opportunity to interpret the statute in the first instance. That course is consistent with principles of Chevron deference, and with the respect due Congress’s delegation of interpretive authority to the agency. But this rule should not be extended beyond its rationale.
The rationale that animates all Prill remands is real and genuine doubt concerning what interpretation the agency would choose if given the opportunity to apply “any permissible construction.” See, e.g., Prill, 755 F.2d at 956-67 (“This is not a case in which the ‘mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached.’ ... [W]e cannot say that the Board’s error in this case clearly had no bearing on the result reached.”) (quoting Massachusetts Trustees v. United States, 377 U.S. 235, 248, 84 S.Ct. 1236, 1245, 12 L.Ed.2d 268 (1964)). Here, though, there is no such open question. We know how the agency would choose to interpret the statute because, unlike the situations in the cases on which the majority relies, the agency reached its interpretation in the course of a purely discretionary act, and the substance of its preferred interpretation is implicit in the decision to exercise that discretion.
In the cases cited by the majority, we were reviewing proceedings initiated by members of the regulated community demanding that the agency take corrective action required by the invoked statute. Prill brought an unfair labor practice complaint alleging that his termination was based on actions protected as “concerted *809 activity” under the National Labor Relations Act. See Prill, 755 F.2d at 942. Alarm, Industry was initiated when an alarm monitoring trade association moved the FCC for an order to show cause why Ameritech’s acquisition of a corporation’s alarm monitoring assets did not violate the Telecommunications Act. See 131 F.3d at 1068. In Transitional Hospitals, a pair of long-term care hospitals contended that certain Medicare reimbursement regulations violated the governing statute. See 222 F.3d at 1022-23. And in Arizona v. Thompson, six states challenged regulations restricting the use of grants from the Department of Health and Human Services. See 281 F.3d at 250. In each case, the agency determined that the statute at issue unambiguously rendered it powerless to grant relief.
Not so here. The majority’s premise is only that DEA believed that Congress compelled an interpretation of Section 971 that permits the agency to reach the diversion of ephedrine in finished drug products. Section 971(c)(1) is a permissive grant of authority. The majority does not suggest that DEA believed that Congress compelled an interpretation that required it to suspend PDK’s imports. Here, DEA could have — in an exercise of prosecutorial discretion — granted PDK relief and vacated the orders to suspend shipment. But DEA — in an exercise of that same prosecutorial discretion — chose not to grant relief to PDK. That makes this case very different from Prill and its progeny.
DEA wanted to suspend PDK’s imports. We know this because it did suspend the imports. If it did not want to, the agency had discretion to choose otherwise. Given its manifest desire to suspend PDK’s imports, it is fanciful to suggest that the agency — when presented on remand with an opportunity to choose “any permissible construction” of Section 971 — will choose an interpretation that diminishes its discretion to an extent that places PDK’s imports beyond its reach. Under these circumstances, I can find no reasonable and genuine doubt that the agency — if, as the majority says, it is truly free to choose among “any permissible construction,” ie., any construction “not in conflict with the plain language of the statute,” K Mart Corp. v. Cartier Inc., 486 U.S. 281, 292, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988) — will elect a narrower, self-abnegating interpretation.
In the absence of such doubt, a Prill remand outstrips its rationale. “ ‘Chenery does not require that we convert judicial review of agency action into a ping-pong game.’ ” Time, Inc. v. U.S. Postal Serv., 667 F.2d 329, 335 (2d Cir.1981) (Friendly, J.) (quoting NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766-67 n. 6, 89 S.Ct. 1426, 1429-30 n. 6, 22 L.Ed.2d 709 (1969) (plurality opinion)); see Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir.1989) (Posner, J.) (“No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.”); Illinois v. ICC, 722 F.2d 1341, 1348 (7th Cir.1983) (Posner, J.) (“Chenery does not require futile gestures.”). This is especially the case where, as here, we have the Deputy Administrator’s informed explanation of the reasonable grounds for his interpretation.
* * *
I end where I began — with regret that the majority feels compelled to address far-reaching questions on which we disagree, when they are wholly unnecessary to the disposition of the case. As Justice Frankfurter once put it: “These are perplexing questions. Their difficulty admonishes us to observe the wise limitations on *810 our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case.” Whitehouse v. Illinois Central R. Co., 349 U.S. 366, 372-73, 75 S.Ct. 845, 850, 99 L.Ed. 1155 (1955).

. The majority asserts that ''[i]f 'the chemical may be diverted' means only diversion of ephedrine away from the manufacturer during importation, the statute does indeed contain words of limitation.” Maj. Op. at 797 *802 n.3 (emphasis in original). No. The majority can choose to read the words “away from the manufacturer during importation” into the statute, but it cannot claim that the statute contains those words of limitation.

. The majority says I err by considering “listed chemical” apart from “may be diverted.” See Maj. Op. at 794 n.l. I look my cue, of course, from Congress, which treated "listed chemical” as a separately defined term in the statute. See 21 U.S.C. § 802(33)-(35). And I do not see any significant difference between asking whether a “listed chemical” "may be diverted” and whether a "listed chemical may be diverted.”

. Not to chase down every rabbit spooked by the majority’s alternative holding, but the fact that DEA did not, as the majority notes, request “any special deference to the Deputy Administralor's judgment about the meaning of the provision,” Maj. Op. at 794, would seem to be without consequence. DEA is clearly entitled to Chevron deference — it has *804 been delegated the authority both to issue legislative rules and to engage in binding adjudications under the statute, either of which triggers the applicability of Chevron. See Thomas W. Merrill & Kristin E. Hickman, Chevron's Domain, 89 Geo. L. J. 833, 900-01 (2001). We have never held that an agency must mouth magic words before we will apply the deference required by a congressional delegation of authority to the agency. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 1717-18, 114 L.Ed.2d 152 (1991) (“When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.”); ISI Int’l, Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548, 551 (7th Cir.2001) (Easterbrook, J.) (“Federal courts are entitled to apply the right body of law, whether the parties name it or not.”). Moreover, DEA’s reticence on this score is understandable. The terms at issue here are more typically implicated in criminal prosecutions to which Chevron does not apply. It is not difficult to see why DEA would prefer not to invite a holding from this court that is predicated on a conclusion that those terms are ambiguous.

. The DCDCA also limited the exception for chemical mixtures to those found by the Attorney General to be "formulated in such a way that it cannot be easily used in the illicit production of a controlled substance and that the listed chemical or chemicals contained in the mixture cannot be readily recovered.” See DCDCA § 2(a)(6)(D), 107 Stat. at 2334 (codified at 21 U.S.C. § 802(39)(A)(v)).

. This structured argument also answers the majority's contention (Maj. Op. at 795) that Section 814(a)’s separate use of the terms "drug” and "listed chemical” demonstrates that drugs cannot be treated as listed chemicals. Section 814(a) requires the Attorney General to "remove from exemption under section 802(39)(A)(iv) ... a drug or group of drugs that the Attorney General finds is being diverted to obtain a listed chemical.” 21 *806 U.S.C. § 814(a); see also id. § 802(39) (A) (iv) (I) (bb). The exemption referenced is the exemption from “regulated transaction” status for transactions “in a listed chemical that is contained in a [FDA-approved] drug.” Id. § 802(39)(A)(iv). The fact that Congress, in Section 814(a), told the Attorney General to revoke this exemption in certain circumstances means that, in the absence of such an exemption, transactions in FDA-approved drugs containing listed chemicals can be treated as regulated transactions — that is, transactions in listed chemicals. See id. § 802(39)(A). The majority’s invocation of Section 814(e), concerning the road to reinstatement of that exemption for ephedrine-containing drugs, only reinforces this point in a particularly germane way.

. The majority protests that the DCDCA is irrelevant because it did not alter the language of Section 971(c)(1). See Maj. Op. at 795 n.2. The language of Section 971(c)(1) was not changed, but the meaning of that language was. The DCDCA — and the CMCA after it — broadened the scope of the defined term “regulated transaction” in Section 802 — a term that appears in the text of Section 971(c)(1) — to include transactions in drugs containing ephedrine. Section 971 applies to that class of "regulated transactions” that are imports and exports, i.e., imports and exports of listed chemicals; by specifying that "regulated transactions” include transactions in drug products containing ephedrine, the DCDCA and CMCA changed the reach of Section 971.
In faulting the Deputy Administrator’s reasoning along these lines, the majority gives insufficient weight to the agency’s views on how the statutes Congress entrusted to the agency to administer should be read together. See, e.g., Natural Resources Defense Council, Inc. v. ERA, 859 F.2d 156, 202 (D.C.Cir.1988) (“As the agency charged with interpreting the complicated statutory provisions that comprise the [Clean Water Act], EPA is entitled to considerable deference in the interpretive process of making the regulatory machinery work.”). The majority’s suggested reading would also lead to the incongruous result that DEA could reach transactions involving drugs containing ephedrine as "regulated transactions" under other provisions, but could not address those same transactions through its Section 971 power, despite the lack of any evidence that Congress wanted DEA to address such transactions armed with only part of its usual arsenal. More fundamentally, the majority's objections to the Deputy Administrator’s analysis sound in Chevron step one, when the whole point is that he was not undertaking to show that his reading of the statute was unambiguously compelled. See infra at 806-08.

. In the Proposed Final Order submitted with its exceptions to the ALJ decision, the government sought to have the Deputy Administrator rely on ”[t]he plain language of this statutory provision” and conclude that "the statute's plain meaning is clear.” Government's Exceptions to Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision of the ALJ (Apr. 25, 2002), App. A, at 5, 6. Although he adopted much of the government’s Proposed Final Order, the Deputy Administrator did not accept that language.

. In a footnote to the just-quoted passage, the majority states that the Deputy Administrator “use[d] 'the traditional tools of statutory construction.' ” Id. at 797 n. 4 (quoting Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9).